William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (504) 509-5023
williammost@gmail.com

Garret S. DeReus (LA # 35105)
Admission *pro hac vice* – To Be Filed
Andrew D. Bizer (LA # 30396)
Admission *pro hac vice* – To Be Filed
BIZER & DEREUS, LLC
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
gdereus@bizerlaw.com
andrew@bizerlaw.com

*Attorneys for Plaintiffs Stephan Namisnak, Francis Falls, and Mitchell Miraglia*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHAN NAMISNAK; FRANCIS FALLS and MITCHELL MIRAGLIA, | Case No.: |
| Plaintiffs, | Judge: |
| v. | Magistrate: |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | Notice of Related Case: 3:17-cv-02664 |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

COMPLAINT

# I.   INTRODUCTION

1.      STEPHAN NAMISNAK is a person with a disability who lives in New Orleans, Louisiana. MR. NAMISNAK has Muscular Dystrophy.

2.      FRANCIS FALLS is a person with a disability who lives in New Orleans, Louisiana. MR. FALLS is afflicted with paraplegia as a result of a spinal cord injury. MR. FALLS is also missing his right arm.

3.      MITCHELL MIRAGLIA is a person with a disability who lives in New Orleans, Louisiana. MR. MIRAGLIA is a quadriplegic who has cerebral palsy and requires a wheelchair for mobility.

4.      Each of the named Plaintiffs use an electric wheelchair to get from place to place. Plaintiffs can do practically everything a non-disabled person can do with the appropriate accommodations for their disability – work, travel, and enjoy life. However, Plaintiffs are not able to drive. As a result, Plaintiffs primarily rely on public transportation to get around the New Orleans metro area.

5.      Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber") provide a mobile-phone app service that allows users to call a car to drive them from point A to point B for a fee. The app also allows people who own cars to sign up as drivers to provide those rides.

6.      Uber is operating a nation-wide demand-responsive transportation system.

7.      In some cities, Uber has options for disabled users who use wheelchairs. For example, if a user is in San Francisco, Portland, or Washington, D.C., they are shown an icon in the Uber app for "Uber Access." By selecting that icon, those users shown options – UberASSIST and/or UberWAV. UberASSIST allows a person with a disability to hail a driver who has been specifically trained to assist riders into vehicles and who can accommodate folding wheelchairs,

walkers, and scooters. UberWAV allows a person with a disability to hail a driver with a wheelchair-accessible vehicle.

8.     Due to Plaintiffs' need for a heavy electric wheelchair that cannot be folded up and placed in a car's trunk, they are unable to utilize UberASSIST. However, Plaintiffs could benefit and utilize UberWAV – if it was available in New Orleans.

9.     Unfortunately, Defendants have refused to make the UberWAV program available to New Orleans users.

10.     As a result of Uber's refusal to make UberWAV available in New Orleans, persons with disabilities in New Orleans have no ability to call an accessible vehicle through the Uber app that will accommodate their needs. Even if there are drivers on the road who have such a vehicle or training, there is no way for a New Orleans users to find an UberWAV vehicle through the app. For this reason, Plaintiffs are excluded from Uber's transportation services and application.

11.     Under the Americans With Disabilities Act, Uber is required to make reasonable modifications to its services, provide auxiliary aids and services, and remove barriers that deter persons with disabilities. Uber is plainly able to do these things – as evidenced by the fact that they offer UberWAV elsewhere. Furthermore, Uber's ability to revise their app is evident by their periodic special promotions in which they alter the app to connect users to puppies, cake, and donuts for a single day.  For example, on the evening of the filing of this Complaint, Uber is hosting a free, "secret" music concert in New Orleans that can only be reached by taking an Uber – and is therefore completely inaccessible to Plaintiffs. Despite their clear ability to alter the app, defendants have chosen not to provide sufficient wheelchair-accessible services in New Orleans, Louisiana.

12.     As such, Uber has violated their legal obligations under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.*, the California Disabled Persons Act,

California Civil Code § 54 *et seq.* ("CDPA"), and California's Unfair Competition Law ("UCL") (Business & Professions Code § 17200 *et seq.*)

13.     According to the U.S. Department of Justice, Title III lawsuits over inaccessible transportation go "to the very heart of the ADA's goals 'to assure equality of opportunity, full participation, independent living, and economic self-sufficiency' for individuals with disabilities."[1] Plaintiffs seek to vindicate the promises of federal and state law.

## II. JURISDICTION AND PARTIES

14.     Jurisdiction: This is an action for relief pursuant to Title III of the Americans With Disabilities Act, 42 U.S.C. § 12181 *et seq.* This Court is vested with original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343. This court is vested with supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as this claim arises out of the same case or controversy as the federal claim.

15.     Intradistrict Assignment: Because the claims described *infra* arose in the County of San Francisco, this case should be assigned to the San Francisco or Oakland Division of the Northern District of California per Local Rule 3-2(d).

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants are headquartered in San Francisco, California.

17.     **Plaintiff STEPHAN NAMISNAK** is a citizen and resident of New Orleans, Louisiana. He uses an electric wheelchair for mobility. He is disabled within the meaning of the ADA. Mr. Namisnak's motorized wheelchair cannot be folded into the trunk of a car.

18.     **Plaintiff FRANCIS FALLS** is a citizen and resident of New Orleans, Louisiana. He uses an electric wheelchair for mobility. He is disabled within the meaning of the ADA. He requires

---

[1] *National Federation of the Blind of California v. Uber Technologies, Inc*., N. D. Cal. 14-cv-4086, R. Doc. 29 at 4.

wheelchair accessible vehicles for transportation. He uses a motorized wheelchair that cannot be folded into the trunk of a car.

19.     **Plaintiff MITCHELL MIRAGLIA** is a citizen and resident of New Orleans, Louisiana. He uses an electric wheelchair for mobility. He is disabled within the meaning of the ADA. Mr. Miraglia's motorized wheelchair cannot be folded into the trunk of a car.

20.     **Defendant UBER TECHNOLOGIES, INC.** is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Uber Technologies, Inc.'s subsidiary, Rasier, LLC is registered with the Louisiana Secretary of State as charter number 41604705F.

21.     **Defendant RASIER, LLC** is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Rasier, LLC is registered with the Louisiana Secretary of State as charter number 41585719Q.

22.     Together, Defendants provide an extremely popular vehicles-for-hire service whereby Uber drivers pick up customers and provide them with transportation in an automobile. Defendants do not provide vehicles-for-hire services to mobility-impaired consumers in New Orleans who require wheelchair-accessible transportation vehicles that can accommodate an electric wheelchair.

### III.    FACTS

<u>Defendants Operate a Vehicle-for-Hire Transportation System in New Orleans</u>

23.     Uber pioneered the vehicle-for-hire market across the United States. Anyone with access to a smartphone can request travel services from Uber. Uber's customers use a smartphone application to locate, schedule, and pay for their travel. Consumers enter into contracts and business relationships by contacting Uber via electronic notification using an application downloaded to their smartphone (hereinafter known as the "Uber Application"). Upon receipt of a

COMPLAINT

request from a customer, Uber then dispatch a driver and vehicle to pick up the customer for transport to their desired location. Through use of the Uber Application, consumers agree to pay for the services with a credit card via their smartphone.  These charges may include safety fees, municipal fees, and other fees.

24.     Unlike taxi vehicles in New Orleans, where the fare rate is set by the New Orleans City Council, the fare rates for Uber customers is set by Uber according to Uber's confidential and secret algorithm. Pursuant to Uber's confidential and secret algorithm, Uber can charge more for its services depending on the time of day, number of drivers, or estimated profitability. The decision on the price displayed on the Uber Application is set solely by Uber.

25.     Upon information and belief, Uber can deduct fare from a driver if a rider complains about his/her safety, the professionalism of the driver, cleanliness of the vehicle, or incorrect designation and/or charges, among other issues.

26.     Uber requires that riders provide a "rating" of their driver prior to the next trip; Uber requests that drivers provide a "rating" of their rider prior to the next trip. These rating facilitate the transportation experience and provide valuable data and information to Uber.

27.     Uber has the ability and option to temporarily or permanently deactivate a rider's account.

28.     Uber has the ability and option to temporarily or permanently deactivate a driver's account.

29.     Uber has the ability to charge a rider a "post-ride" fee (*i.e.* a cleaning fee) at the request of a rider.

30.     In the New Orleans area, Uber has the ability to "geo-lock" certain locations and prevent drivers from visiting those geographic areas.

31.     Upon information and belief, in the New Orleans area Uber has actually utilized its

ability to "geo-lock" certain locations.

32.    Upon information and belief, Uber has the ability to exclude drivers based on personal features – such as how many years they have had a driver's license in the United States.

33.    Upon information and belief, Uber has a policy against allowing individuals who have had a driver's license in the United States for less than one year for driving for Uber in the New Orleans area.

34.    Upon information and belief, Uber has (or had in the recent past) a policy against allowing individuals with non-Louisiana license plates from driving for Uber in the New Orleans area.

35.    Upon information and belief, Uber assists, or has assted, drivers with purchasing new cars via co-signing leases and/or ownership agreements (*i.e.* https://www.youtube.com/watch?v=5-Jx6G68Wpo).

36.    Uber's prior CEO wrote on Uber's official blog: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a transportation system in a city near you."

37.    Upon information and belief, would-be drivers are required to pass a "city knowledge test" and attend a brief interview with an employee of Uber. Upon information and belief, Uber has previously referred to itself as an "On– Demand Car Service."

38.    As one court summed it up:

Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring their performance, disciplining (or terminating) those who fail to meet standards, and setting prices.[2]

39.    Uber has explicitly declared itself to be a "transportation system" over and over again. A few examples:

    A.    Decemember 5, 2011: "We are 'Everyone's Private Driver.' We are Uber

---

[2] *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1137 (N.D. Cal. 2015).

COMPLAINT

and we're rolling out a **transportation system** in a city near you."[3]

B.    March 8, 2012: "So today could eventually be considered historical for the city of Angels because it is today that **Uber LA** **is officially rolling out its transportation system** in this fine city. Now, how is some on-demand town car service calling itself a **transportation system**? And how are a bunch of limos going to make this city better? We've got a bunch of examples for you, but let me start with this: for every well utilized UberCar on the road, we're taking 6 cars off the road and out of parking garages."[4]

C.    June 8, 2012: Uber seeks to deliver the "World's Finest T**ransportation System**"[5]

D.    August 2, 2013: "We're finally giving this city the **transportation system** that it deserves."[6]

E.    Uber engineers' code "will contribute to accelerating the growth of a **transportation system** that will directly affect the lives of more than three million people every single day."[7]

F.    August 22: 2014: Uber "provides the city with a more efficient transportation system."[8]

G.    December 14, 2014: "Uber platform allows for safe and reliable rides, supporting and extending New Jersey's public **transportation system**."[9]

H.    June 17, 2015: "Uber is proud to support the Taxi and Limousine Commission's revised rules which allow tech innovation to continue making New York City's **transportation system** more progressive for all riders and drivers and ensure that drivers and passengers are protected."[10]

I.    July 22, 2015: "Together, we can build an even better, more reliable **transportation system**. This is great news for all New Yorkers, including Uber riders and drivers."[11]

---

[3] https://newsroom.uber.com/take-ubers-new-logo-for-a-spin/
[4] https://newsroom.uber.com/us-california/uber-la-officially-launched/
[5] https://newsroom.uber.com/us-california/san-diego-launch/
[6] https://newsroom.uber.com/mexico/uber-has-launched-in-mexico-city/
[7] https://join.uber.com/engineering
[8] https://newsroom.uber.com/indonesia/delivering-a-new-choice-to-jakarta/
[9] https://www.uber.com/blog/new-jersey/uber-improves-public-transportation-in-new-jersey/
[10] https://newsroom.uber.com/us-new-york/statement-on-revised-tlc-rules/
[11] https://newsroom.uber.com/us-new-york/statement-from-uber-nyc-general-manager-josh-mohrer/

- 8 -          COMPLAINT

40.     Given Paragraphs 18 through 39, Uber is a transportation system and is engaged in the provision of a transportation service and is therefore obligated to comply with the transportation statutes and regulations of the ADA, found at 42 U.S.C § 12184 and 49 C.F.R. §§ 37.1-105.

41.     Given Paragraphs 18 through 39, as the provider of a transportation system, Uber is obligated to comply with the equivalent service standard set forth at 49 C.F.R. § 37.105.

<u>Plaintiffs are Unable to Use Defendants' New Orleans App and Transportation Services in Their Current Form</u>

42.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA desire service from vehicles for hire to run errands, attend community meetings, reach medical appointments, access medical services, engage in recreational activities, and to participate in civic engagement events. Plaintiffs are able to utilize some aspects of public transportation services. However, access to Uber's transportation services would provide Plaintiffs with a level of convenience not afforded by public transportation.

43.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA cannot successfully use Uber transportation services because Uber has completely failed to provide a button, option, or icon on the Uber Application for the New Orleans metro market which would allow a wheelchair user to summon a van-equipped vehicle.

44.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA are aware that UberASSIST exists, but are is also aware that UberASSIST would not provide them with the ability to hail a lift-equipped vehicle. Without a lift-equipped vehicle Plaintiffs are unable to patronize Uber's services. Accordingly, Plaintiffs FALLS and NAMISNAK are presently deterred from downloading the Uber application.

COMPLAINT

45.     Plaintiff MITCHELL MIRAGLIA previously downloaded the Uber application. Upon downloading the application, he messaged Uber asking if wheelchair accessible service was available.

46.     Upon information and belief, Uber sent a response message stating that wheelchair accessible service was not available.

47.     Upon information and belief, after learning that Uber does not provide accessible service in New Orleans, Plaintiff MITCHELL MIRAGLIA deleted the Uber application.

48.     By failing to provide service to MITCHELL MIRAGLIA, Uber was in total breach of any agreement or contract entered into with MITCHELL MIRAGLIA. By and through its total breach of the agreement, MITCHELL MIRAGLIA had sufficient grounds for recission of the contract.

49.     By deleting the Uber application, MITCHELL MIRAGLIA rescinded any agreement or contract he entered into with Uber.

50.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA are presently aware that if they tried to install and use the Uber Application that they would experience serious difficulty accessing the goods and utilizing the services offered by that service as a result of Uber's (1) failure to provide a button, option, or icon which provides access to an accessible vehicle capable of transporting an electric wheelchair, (2) failure to provide auxiliary aids and services necessary to allow full use and enjoyment of its transportation services, and (3) failure to ensure that a minimum number of accessible vehicles in Uber's fleet are wheelchair-accessible.

51.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA desire to use the Uber Application, but fear that they will experience serious difficulty in utilizing the application due to the discrimination detailed herein.

COMPLAINT

52.     An accessible transportation option through the Uber app would make STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA more independent.

53.     The ADA violations detailed herein exclude FRANCIS STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA from the programs, services, and accommodations offered by Defendants to the public.

54.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA plan to and will attempt to use the Uber Application and Uber's programs, services, and accommodations in the future as patrons should those programs, services, and accommodations become wheelchair-accessible.

55.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA presently fear that they will encounter the mobility-related barriers which exist within Uber's Application and services.

56.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA desire to utilize the Uber Application and service, but will continue to experience serious difficulty until the ADA violations detailed herein are removed.

57.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA intend to and will attempt to utilize Uber's programs, services, and accommodations in the future, but fear that Uber will continue to discriminate against them by failing to bring their Uber Application and transportation services into compliance with the requirements of the ADA.

58.     Upon information and belief, making the programs, services, and accommodations offered through the Uber Application accessible to persons with mobility-related disabilities is readily achievable, reasonably feasible, and easily accomplished, and would not place an undue burden on Uber.

COMPLAINT

59.     Upon information and belief, making the programs, services, and accommodations offered through the Uber Application accessible would provide STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA with an equal opportunity to participate in, or benefit from, the programs, services, and accommodations which Uber offers to the general public.

60.     The harm sustained by Plaintiffs – the inability to access the services and accommodations offered by Uber – is the expected and foreseeable consequence of Uber's failure to comply with the requirements and mandates of the ADA. The statute and accompanying regulations exist to ensure that those with mobility-related limitations will have full use of transportation services. If Uber failed to adhere to its legal obligations under these regulations, it was imminently foreseeable that individuals with disabilities would sustain the exact harms alleged by Plaintiffs in this lawsuit.

61.     STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA have been obligated to retain the undersigned counsel for the filing and prosecution of this action. STEPHAN NAMISNAK, FRANCIS FALLS, and MITCHELL MIRAGLIA are entitled to have their reasonable attorneys' fees, costs, and expenses paid by Uber, pursuant to 42 U.S.C. § 12205.

<u>Uber's History of App Modifications</u>

62.     Upon information and belief, modification of the programs, services, and accommodations offered through the Uber Application could be easily accomplished, as is evidenced by the various promotions and modifications which are commonly made by Uber during the regular course of their operations.

63.     On January 5, 2015, Uber ran a promotion in New Orleans known as "Uber King Cakes." During this promotion, the Uber Application would display a small King Cake.[12] Customers could select this "King Cake" icon and have drivers deliver a King Cake to them for a

---

[12] *See* Exhibit "A."

COMPLAINT

fee. This change to the Uber Application was only present for one day. At the conclusion of the promotion, Uber restored the Uber Application to its original state.

64.     On Thursday, August 27, 2015, in Philadelphia, Pennsylvania Uber ran a promotion known as "UberPUPPIES."[13] During this promotion customers could utilize the Uber Application to have drivers deliver a live Puppy to their office for "15 minutes of puptastic playtime." Upon information and belief, at the end of the "UberPUPPIES" promotion, the Uber Application returned to its original state.

65.     On April 13, 2016, in New Orleans, Uber ran a promotion known as "UberDONUTS."[14] From 10:00am to 12:00pm, users could select a donut icon in their Uber app to have a driver deliver two free donuts to their door. At the end of the "UberDONUTS" promotion, the Uber Application returned to its original state.

66.     The above examples demonstrate how easy it would be for Uber to provide a wheelchair-accessible icon or button on its Uber Application for the New Orleans metro market, as it does in other cities. Despite the ease with which Uber could make its service available to persons in a wheelchair, Uber has intentionally chosen to not provide services to persons who use electric wheelchairs in New Orleans.

---

[13] *See* Exhibit "B."
[14] https://newsroom.uber.com/us-louisiana/uberversary-donuts-on-demand/

COMPLAINT

67.     In some limited locations, Uber have installed an icon on its Uber Application in an attempt to comply with the ADA. In some cities, including San Francisco, Los Angeles, Portland, and Washington D.C., Uber have installed on its Uber Application an icon known as Uber Access. (*See* Figure One, *infra*.).

68.     Once a user selects the Access icon, one or two of two options appear: UberASSIST and UberWAV.

69.     UberASSIST, according to Uber, "is designed to provide additional assistance to seniors and people with disabilities. Driver-partners are specifically trained by Open Doors Organization to as              not New Orleans, LA.                                  walkers, and scooters."[15]

**Fig. 1**: An image of Uber Access, available in some cities – but not New Orleans, LA.
(*Source*: https://newsroom.uber.com/canada/uberwav/)



70.     However, according to Uber, "Note: ASSIST vehicles do not have accessible ramps."[16]

71.     Persons who use an electric wheelchair are unable to use UberASSIST as they require transportation with a ramp.

---

[15] *See* Exhibit "C"

[16] *Id*.

72.    Upon information and belief, in San Francisco, Los Angeles, and other cities, Defendants offers UberWAV, which provides wheelchair accessible vehicles.

73.    Upon information and belief, Uber can remove their accessible icons at any time, thereby creating a significant need for injunctive relief. On September 2, 2014, Uber issued a press release stating that it was offering accessible transportation services in Houston, Texas.

74.    Upon information and belief, Uber began offering accessible transportation service in Houston, Texas called UberACCESS.

75.    As of May 6, 2017, the Uber Application for Houston, Texas does not feature or display UberACCESS. (*See* Figure 2, *Infra*).



**Fig. 2**: An image of Uber's app available in Houston, Texas as of May 6, 2017.
(*Source*: Screenshot taken by plaintiff's counsel)

76.    Upon information and belief, Uber either discontinued its UberACCESS service in Houston, Texas or no longer publicly displays the UberACCESS option. This demonstrates that

1   Uber has the capability to reduce or eliminate its accessibility options at will, and evidences the

2   need for injunctive relief.

3       77.     On information and belief, when a driver with a wheelchair-accessible vehicle in a

4   city without UberWAV contacts Uber, they are told that they cannot participate in UberWAV.

5       78.     The actions committed by Uber which resulted in this lawsuit have their genesis or

6   origin in the San Francisco, California.

7       79.     Upon information and belief, Uber created and performs modifications to the Uber

8   Application from San Francisco, California.

9       80.     Upon information and belief, Uber enacts and supervises its policies from San

10  Francisco, California.

11      81.     Upon information and belief, Uber exert significant control over the implementation

12  of its policies from San Francisco, California.

13      82.     Upon information and belief, a majority of Uber's supervision of its drivers occurs

14  from San Francisco, California.

15                  <u>Uber's Free Galantis Show and Exclusion of Plaintiffs</u>

16      83.     On Tuesday, October 24, 2017, Uber sent out an email to its customers entitled

17  "Shhh. Galantis has a secret show Thursday night."

18      84.     The top of the email contained a photographs of the band Galantis. Immediately

19  below the photograph was an image of Uber logo and the following text:

20          "This Thursday night, we're going to give you something to do–we're hosting a

21          secret show featuring Galantis!

22          Wanna run away to an exclusive performance? Your ticket is in your Uber app."

23      85.     Information about Uber's free Galantis show was widely publicized over the

24

COMPLAINT

internet, including through Uber's Blog[17], through River Beats, a broadcasting and media

production company in New Orleans[18], and through social media. (See Exhibit D.)

86.     Based on available information, on Thursday, October 26, 2017, at 6:00 p.m., Uber's

application will change and will display an option for "Galantis." Based on the information

provided by Uber, customers who select this option will be picked up (along with 3 guests) and will

brought to a secret show for an exclusive intimate performance by Galantis.

87.     Unfortunately, due to the lack of any options for the summoning of a Wheelchair

Accessible Vehicles through the Uber application, Plaintiffs are completely excluded from the free,

secret Galantis show that is hosted by Uber.

88.     Further, due to the "secret" nature of Uber's event featuring Galantis, Plaintiffs are

unable to otherwise attend or patronize the event.

89.     All three named Plaintiffs were aware of the free Galantis show hosted by Uber and

are deterred from making an attempt to patronize this show due to Uber's complete failure to

provide Wheelchair Accessible Vehicles or another means of accessing the event.

90.     Given Paragraphs 83 through 89, Uber is also operating a place of public

accommodation and is therefore was obligated to comply with the statutes and regulations for

places of public accommodation, namely 42 U.S.C § 12182 and 28 C.F.R. § 36.101-310.

### IV. CAUSES OF ACTION

### COUNT I – VIOLATION OF TITLE III
### OF THE AMERICANS WITH DISABILITIES ACT

91.     Plaintiffs re-allege and incorporate by reference the above allegations set forth in the

Complaint as if fully set forth herein.

---

[17] https://www.uber.com/blog/new-orleans/galantis-secret-show/ (last accessed on 10/25/2017).
[18] https://riverbeats.life/galantis-teams-uber-launch-secret-show-new-orleans/ (last accessed on 10/25/2017).

92.     Title III of the ADA prohibits discrimination against persons with disabilities by places of public accommodation and by private entities providing certain services, including specified public transportation services. *Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 128 (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."); 42 U.S.C. § 12182 ("Prohibition of discrimination by public accommodations"); 42 U.S .C. § 12184 ("Prohibition of discrimination in specified public transportation services provided by private entities").

93.     "The term 'specified public transportation' means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10). Public transportation services include "demand responsive systems," which means "any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system." 42 U.S.C. § 12181(3).

94.     In addition, regulations promulgated by the United States Secretary of Transportation provide that: "No entity shall discriminate against an individual with a disability in connection with the provision of transportation service." 49 C.F.R. § 37.5(a).

95.     Defendants provide a demand responsive transportation system as defined by 42 U.S.C. § 12181. Defendants have been held to be a covered entity under Title III of the ADA. *See, e.g., Ramos v. Uber Technologies*, 2015 WL 758087 at *5-6 (W.D. Tex., Feb. 20, 2015).

96.     Under Section 12184(a)(2) of the ADA, discrimination includes the failure of an entity to:

    (A)     make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title;

    (B)     provide auxiliary aids and services consistent with the requirements of section 12182(b)(2)(A)(iii) of this title; and

COMPLAINT

(C)     remove barriers consistent with the requirements of section 12182(b)(2)(A) of this title and with the requirements of section 12183(a)(2) of this title;

97.     Under Section 12182(b)(2)(C)(i) of the ADA, discrimination can also include: "a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities."

98.     "Equivalent" is defined under the ADA's regulations at 49 CFR § 37.105 to mean "equivalent to the service provided other individuals with respect to the following service characteristics:

> (a)     (1) Schedules/headways (if the system is fixed route);
>             (2) Response time (if the system is demand responsive);
> (b) Fares;
> (c) Geographic area of service;
> (d) Hours and days of service;
> (e) Availability of information;
> (f) Reservations capability (if the system is demand responsive);
> (g) Any constraints on capacity or service availability;
> (h) Restrictions priorities based on trip purpose (if the system is demand responsive).

99.     Defendants and their service providers have failed to provide any mechanism by which to adequately serve mobility-impaired individuals such as Plaintiffs or others similarly situated. Moreover, Defendants have refused to make reasonable accommodations in policies, practices, and procedures or to provide auxiliary aids and services necessary to allow full use and enjoyment of their transportation services by Plaintiffs. Defendants have failed to remove the barriers to Plaintiffs' use of their services.

100.    Defendants have discriminated and are discriminating against Plaintiffs in violation of the ADA by failing to provide accessible transportation services.

101.    Defendants continue to discriminate against the Plaintiffs by failing to make reasonable modifications in policies, practices or procedures, when such modifications are

necessary to afford accessible transportation services to individuals with disabilities; and by failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, denied goods and services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.

102.   Additionally, by failing to provide access options to New Orleans users who require an electric wheelchair, Defendants have failed to meet the requirements of 49 C.F.R. § 37.167 that "the entity shall make available to individuals with disabilities adequate information concerning transportation services, [which] includes making adequate communications capacity available, though accessible formats and technology, to enable users to obtain information and schedule service."

103.   Defendants have discriminated and are discriminating against Plaintiffs in violation of the ADA by failing to make a place a public accommodation accessible to Plaintiffs. Namely, Defendants have failed to provide a means by which Plaintiffs can access the free, secret Galantis show. This show is available and accessible to persons who do not have a disability that requires them to utilize an electric wheelchair.

104.   Plaintiffs have been injured by the discrimination they encountered when they were deterred from using Defendants' transportation services and they continue to be injured by their inability to patronize Defendants' services. They have additionally been injured by the stigma of Defendants' discrimination.

105.   Plaintiffs' injuries are traceable to Defendants' discriminatory conduct, policies, or lack of policies alleged herein and will be redressed by the relief requested. Plaintiffs have been injured and will continue to be injured by Defendants' failure to comply with the ADA and Defendants' ongoing, continued acts of discrimination.

106.   Defendants have control over their drivers' ADA compliance. For example, a term of the contract between Uber and its drivers bars drivers from denying users who have service animals:

> You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

107.   The Uber contract with drivers does *not*, however, have a provision barring drivers from denying service to wheelchair users.

108.   As a result of their inability to use Defendants' services, Plaintiffs are suffering irreparable harm.

109.   Although Plaintiffs have not downloaded or used the Uber Application, Title III of the ADA does not "require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188; *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1136–37 (9th Cir.2002) ("under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury," and "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues").

110.   Here, Plaintiffs are being deterred from patronizing Defendants' services as a result of their personal knowledge of the violations stated above. Defendants' refusal to provide service to

people with disabilities in New Orleans is a topic of conversation among Plaintiffs' community. Plaintiffs are aware that UberWAV is offered in other cities but not in New Orleans.

111.    Plaintiffs have experienced the difficulty and frustration of past denials of services, including transportation services, in other contexts, and so chose not to engage in a process they know to be futile with Uber.

112.    Pursuant to 42 U.S.C. § 12188, this Court has authority to grant Plaintiffs' injunctive relief, including an Order that Defendants' transportation services are in violation of the ADA and requiring Defendants' to alter the Uber Application to make it accessible to and useable by individuals with mobility disabilities to the full extent required by Title III of the ADA.

## COUNT II - VIOLATION OF THE CALIFORNIA DISABLED PERSONS ACT

113.    Plaintiffs re-allege and incorporate by reference the above allegations set forth in the Complaint as if fully set forth herein.

114.    Pursuant to the remedies, procedures, and rights set forth in Cal. Civ. Code § 52, Plaintiffs pray for judgment as set forth below.

115.    Defendants operate, within the jurisdiction of the State of California, places of public accommodation and/or places to which the general public is invited and, as such, is obligated to comply with the provisions of the California Disabled Persons Act (CDPA), Cal. Civ. Code § 54, *et seq*.

116.    The conduct alleged herein violated the CDPA, including without limitation Cal. Civ. Code, § 54.1, *et seq*. The CDPA guarantees, *inter alia*, that persons with disabilities are entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, and privileges of covered entities.

117.    Defendants have violated the CDPA by, *inter alia*, denying Plaintiff and members of the proposed class, as persons with disabilities, full and equal access, as other members of the general public, to accommodations, advantages, and facilities offered by Defendants.

118.    Defendants have violated the CDPA by, *inter alia*, failing to operate their services on a nondiscriminatory basis and failing to ensure that persons with disabilities have nondiscriminatory access to their transportation services.

119.    In committing the acts and/or omissions alleged herein, Defendants wrongfully and unlawfully denied access to their transportation services to individuals with disabilities and acted with knowledge of the effect their conduct was having on persons with physical disabilities.

120.    Defendants have violated the CDPA by being, as listed above, in violation of both California Standards and the ADA.  Plaintiffs are not required to prove intent or actual damages to recover minimum statutory damages under the CPDA.

121.    Plaintiffs are deterred from patronizing Defendants' transportation services as a result of their actual knowledge of the violations stated above.

122.    Pursuant to the remedies, procedures, and rights set forth in California law, including Cal. Civ. Code § 54, Plaintiff prays for judgment as set forth below.

## COUNT III – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

123.    Plaintiffs re-allege and incorporate by reference the above allegations set forth in the Complaint as if fully set forth herein.

124.    California's Unfair Competition Law ("UCL") (Business & Professions Code § 17200 *et seq.*) bars "unfair competition," which includes any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

125.    In passing the UCL, the legislature "intended to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur." Comm. *on Children's*

1    *Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 210 (1983).

2        126.    The UCL "'borrows' violations of other laws and treats these violations, when

3    committed pursuant to business activity, as unlawful practices independently actionable under [the

4    UCL]." *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992); *Clerkin v. MyLife.com, Inc.*,

5    No. C 11– 00527 CW, 2011 WL 3607496, at *6 (N.D. Cal. Aug. 16, 2011) ("Violation of almost

6    any federal, state or local law may serve as the basis for a UCL claim.").

7        127.    Defendants business practices described above are unfair competition under the UCL

8    because they violate the ADA and CDPA.

9        128.    Defendants business practices described above are unfair competition also because

10   Defendants' failure to provide accommodations gives them an unfair advantage relative to

11   traditional taxi cab companies.

12       129.    As a result of Defendants unfair competition business practices described above,

13   Plaintiffs have suffered injury in fact and have lost money. For example, they have been forced to

14   take more expensive taxi cabs, thus losing money.

15                                    **V. JURY DEMAND**

16       130.    Plaintiffs request a trial by jury.

17                                  **VI. RELIEF REQUESTED**

18       WHEREFORE, Plaintiffs demand judgment against Defendants, and request the following

19   relief:

20   A.    that this Court declare that Defendants' policies, procedures, and services have been

21          provided in a discriminatory manner which violates the ADA, the California Disabled

22          Persons Act, and California's Business & Professions Code § 17200;

23   B.    that this Court declare that Defendants' violations of the anti-discrimination statutes of

24          California were intentional;

COMPLAINT

C.     that this Court Order injunctive relief to require Defendants to bring their transportation service into compliance and remain in compliance with state and federal anti-discrimination statutes;

D.     that this Court award damages in restitution to Plaintiffs;

E.     that this Court award reasonable attorneys' fees and costs (including expert fees) and other expenses of suit; and

F.     that this Court award such other and further relief as it deems necessary, just, proper, and appropriate.

Respectfully submitted, this the twenty-sixth day of October, 2017,

By Plaintiffs, by and through their counsel,

**BIZER & DEREUS, LLC**
Garret S. DeReus (LA # 35105)
Admission *pro hac vice* – To Be Filed
gdereus@bizerlaw.com
Andrew D. Bizer (LA # 30396)
Admission *pro hac vice* – To Be Filed
andrew@bizerlaw.com
jhammack@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

/s/ William Most
William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (504) 509-5023
Email: williammost@gmail.com

- 25 -                                                    COMPLAINT