William Most (CA # 279100)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
T: (504) 509-5023
williammost@gmail.com

Garret S. DeReus (LA # 35105)
Admitted *pro hac vice*
Andrew D. Bizer (LA # 30396)
Admitted *pro hac vice*
BIZER & DEREUS, LLC
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
gdereus@bizerlaw.com
andrew@bizerlaw.com

*Attorneys for Plaintiffs Stephan Namisnak and Francis Falls*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHAN NAMISNAK and FRANCIS FALLS,<br><br>        Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC. and RASIER, LLC,<br><br>        Defendants. | Case No.: 3:17-cv-06124-RS<br><br>Judge: Richard Seeborg<br><br>Notice of Related Case: 3:17-cv-02664 |

## SECOND AMENDED COMPLAINT

## I.   INTRODUCTION

1.     STEPHAN NAMISNAK is a person with a disability who lives in New Orleans, Louisiana. MR. NAMISNAK has Muscular Dystrophy.

2.     FRANCIS FALLS is a person with a disability who lives in New Orleans, Louisiana. MR. FALLS has paraplegia as a result of a spinal cord injury. MR. FALLS is also missing his right arm.

3.     Both Plaintiffs use a motorized wheelchair to get from place to place. Plaintiffs can do practically everything a non-disabled person can do with the appropriate accommodations for their disability – work, travel, and enjoy life. However, Plaintiffs are not able to drive. As a result, Plaintiffs primarily rely on public transportation to get around the New Orleans metro area.

4.     Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber") provide a mobile-phone app service that allows users to call a car to drive them from point A to point B for a fee. The app also allows people who own cars to sign up as drivers to provide those rides.

5.     Uber is operating a nation-wide demand-responsive transportation system.

6.     In some cities, Uber has options for disabled users who use wheelchairs. For example, if a user is in San Francisco, Portland, or Washington, D.C., they are shown an icon in the Uber app for "Uber Access." By selecting that icon, those users shown options – UberASSIST and/or UberWAV. UberASSIST allows a person with a disability to hail a driver who has been specifically trained to assist riders into vehicles and who can accommodate folding wheelchairs, walkers, and scooters. UberWAV allows a person with a disability to hail a driver with a wheelchair-accessible vehicle that can accommodate a motorized wheelchair.

SECOND AMENDED COMPLAINT

7.    Due to Plaintiffs' need for a motorized wheelchair that cannot be folded up and be placed in a car's trunk, they are unable to utilize UberASSIST. However, Plaintiffs could benefit and utilize UberWAV – if it was available in New Orleans.

8.    Unfortunately, Uber has refused to make the UberWAV program available to New Orleans users.

9.    As a result of Uber's refusal to make UberWAV available in New Orleans, persons with disabilities in New Orleans have no ability to call an accessible vehicle through the Uber app that will accommodate their needs. Even if there are drivers on the road who have such a vehicle or training, there is no way for a New Orleans user to find an UberWAV vehicle through the app. For this reason, Plaintiffs are excluded from Uber's transportation services and application.

10.    Under the Americans with Disabilities Act, Uber is required to make reasonable modifications to its services, provide auxiliary aids and services, and remove barriers that deter persons with disabilities. Uber is plainly able to do these things – as evidenced by the fact that it offers UberWAV elsewhere. Furthermore, Uber's ability to revise its application is evident by its periodic special promotions in which Uber alters the application to connect users to puppies, cake, and donuts for a single day. For example, on the evening of the filing of the original Complaint, Uber hosted a free, "secret" music concert in New Orleans that could only be reached by taking an Uber – and was therefore completely inaccessible to Plaintiffs. Despite Uber's clear ability to alter its application, services, and attendant policies/practices, it has chosen not to provide sufficient wheelchair-accessible services in New Orleans, Louisiana.

11.    As such, Uber has violated its legal obligations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.*

12.    According to the U.S. Department of Justice, Title III lawsuits over inaccessible transportation go "to the very heart of the ADA's goals 'to assure equality of opportunity, full

participation, independent living, and economic self-sufficiency' for individuals with disabilities."[1] Plaintiffs seek to vindicate the promises of federal and state law.

## II. JURISDICTION AND PARTIES

13.     Jurisdiction: This is an action for relief pursuant to Title III of the Americans With Disabilities Act, 42 U.S.C. § 12181 *et seq.* This Court is vested with original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

14.     <u>Intradistrict Assignment</u>: Because the claims described *infra* arose in the County of San Francisco, this case should be assigned to the San Francisco or Oakland Division of the Northern District of California per Local Rule 3-2(d).

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Uber is headquartered in San Francisco, California.

16.     **Plaintiff STEPHAN NAMISNAK** is a citizen and resident of New Orleans, Louisiana. He uses a motorized wheelchair for mobility. He is disabled within the meaning of the ADA. Mr. Namisnak's motorized wheelchair cannot be folded into the trunk of a car.

17.     **Plaintiff FRANCIS FALLS** is a citizen and resident of New Orleans, Louisiana. He uses a motorized wheelchair for mobility. He is disabled within the meaning of the ADA. He requires wheelchair accessible vehicles for transportation. He uses a motorized wheelchair that cannot be folded into the trunk of a car.

18.     **Defendant UBER TECHNOLOGIES, INC.** is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Uber Technologies, Inc.'s subsidiary, Rasier, LLC is registered with the Louisiana Secretary of State as charter number 41604705F.

---

[1] *National Federation of the Blind of California v. Uber Technologies, Inc*., N. D. Cal. 14-cv-4086, R. Doc. 29 at 4.

19.   **Defendant RASIER, LLC** is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. Rasier, LLC is registered with the Louisiana Secretary of State as charter number 41585719Q.

20.   Uber provides an extremely popular vehicles-for-hire service whereby Uber drivers pick up customers and provide them with transportation in an automobile. Uber does not provide vehicles-for-hire services to mobility-impaired consumers in New Orleans who require wheelchair-accessible transportation vehicles that can accommodate an electric wheelchair.

### III.   FACTS

A.   Uber Operates a Vehicle-for-Hire Transportation System in New Orleans

21.   Uber pioneered the vehicle-for-hire market across the United States. Anyone with access to a smartphone can request travel services from Uber. Uber's customers use a smartphone application to locate, schedule, and pay for their travel. Consumers enter into contracts and business relationships by contacting Uber via electronic notification using an application downloaded to their smartphone (hereinafter known as the "Uber Application"). Upon receipt of a request from a customer, Uber then dispatches a driver and vehicle to pick up the customer for transport to their desired location. Through use of the Uber Application, consumers agree to pay for the services with a credit card via their smartphone.  These charges may include safety fees, municipal fees, and other fees.

22.   Unlike taxi vehicles in New Orleans, where the fare rate is set by the New Orleans City Council, the fare rates for Uber customers is set by Uber according to Uber's confidential and secret algorithm. Pursuant to Uber's confidential and secret algorithm, Uber can charge more for its services depending on the time of day, number of drivers, or estimated profitability. The decision on the price displayed on the Uber Application is set solely by Uber (and not the drivers).

23.   Upon information and belief, Uber can deduct fare from a driver if a rider complains

- 5 -       SECOND AMENDED COMPLAINT

about his/her safety, the professionalism of the driver, cleanliness of the vehicle, or incorrect designation and/or charges, among other issues.

24.     Uber requires that riders provide a "rating" of their driver prior to the next trip; Uber requests that drivers provide a "rating" of their rider prior to the next trip. These rating facilitate the transportation experience and provide valuable data and information to Uber.

25.     Uber has the option and ability to temporarily or permanently deactivate a rider's account.

26.     Uber has the option and ability to temporarily or permanently deactivate a driver's account.

27.     Uber has the ability to charge a rider a "post-ride" fee (*i.e.* a cleaning fee) at the request of a rider.

28.     In the New Orleans area, Uber has the ability to "geo-lock" certain locations and prevent drivers from visiting those geographic areas.

29.     Upon information and belief, in the New Orleans area Uber has utilized its ability to "geo-lock" certain locations.

30.     Upon information and belief, Uber has the ability to exclude drivers based on personal features – such as how many years they have had a driver's license in the United States.

31.     Upon information and belief, Uber has a policy against allowing individuals who have had a driver's license in the United States for less than one year from driving for Uber in the New Orleans area.

32.     As part of its operation of a transportation service, Uber provides "Hotspots" and heat maps for the New Orleans and surrounding metro areas. This further indicates that Uber is operating a transportation system.

33.     During Mardi Gras Uber provides guides and instructions to drivers on how to get

SECOND AMENDED COMPLAINT

around and operate their vehicles by providing maps of road closure areas.

34.    Similarly, under the "Drivers" tab of its website, Uber provides "Safety pro-tips." These tips include the statement that "Our team is ready to help! With 24/7 phone support, you can speak to one of our support specialists in the Uber Driver app. Just tap 'HELP' and select the phone icon in the top-right corner."

35.    Upon information and belief, Uber has (or had in the recent past) a policy against allowing individuals with non-Louisiana license plates from driving for Uber in the New Orleans area.

36.    Upon information and belief, Uber assists, or has assisted, drivers with purchasing new cars via co-signing leases and/or ownership agreements (*i.e.* https://www.youtube.com/watch?v=5-Jx6G68Wpo).

37.    Uber's prior CEO wrote on Uber's official blog: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a transportation system in a city near you."

38.    Upon information and belief, would-be drivers are required to pass a "city knowledge test" and attend a brief interview with an employee of Uber. Upon information and belief, Uber has previously referred to itself as an "On– Demand Car Service."

39.    As one court summed it up:

Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring their performance, disciplining (or terminating) those who fail to meet standards, and setting prices.[2]

40.    Uber has explicitly declared itself to be a "transportation system" over and over again. A few examples:

A.    December 5, 2011: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a **transportation system** in a city near you."[3]

---

[2] *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1137 (N.D. Cal. 2015).
[3] https://newsroom.uber.com/take-ubers-new-logo-for-a-spin/

- 7 -          SECOND AMENDED COMPLAINT

B.     March 8, 2012: "So today could eventually be considered historical for the city of Angels because it is today that **Uber LA** **is officially rolling out its transportation system** in this fine city.  Now, how is some on-demand town car service calling itself a **transportation system**?  And how are a bunch of limos going to make this city better?  We've got a bunch of examples for you, but let me start with this: for every well utilized UberCar on the road, we're taking 6 cars off the road and out of parking garages."[4]

C.     June 8, 2012: Uber seeks to deliver the "World's Finest T**ransportation System**"[5]

D.     August 2, 2013: "We're finally giving this city the **transportation system** that it deserves."[6]

E.     Uber engineers' code "will contribute to accelerating the growth of a **transportation system** that will directly affect the lives of more than three million people every single day."[7]

F.     August 22: 2014: Uber "provides the city with a more efficient transportation system."[8]

G.     December 14, 2014: "Uber platform allows for safe and reliable rides, supporting and extending New Jersey's public **transportation system**."[9]

H.     June 17, 2015: "Uber is proud to support the Taxi and Limousine Commission's revised rules which allow tech innovation to continue making New York City's **transportation system** more progressive for all riders and drivers and ensure that drivers and passengers are protected."[10]

I.     July 22, 2015: "Together, we can build an even better, more reliable **transportation system**. This is great news for all New Yorkers, including Uber riders and drivers."[11]

41.     Given Paragraphs 18 through 40, Uber is a transportation system and is engaged in

---

[4] https://newsroom.uber.com/us-california/uber-la-officially-launched/
[5] https://newsroom.uber.com/us-california/san-diego-launch/
[6] https://newsroom.uber.com/mexico/uber-has-launched-in-mexico-city/
[7] https://join.uber.com/engineering
[8] https://newsroom.uber.com/indonesia/delivering-a-new-choice-to-jakarta/
[9] https://www.uber.com/blog/new-jersey/uber-improves-public-transportation-in-new-jersey/
[10] https://newsroom.uber.com/us-new-york/statement-on-revised-tlc-rules/
[11] https://newsroom.uber.com/us-new-york/statement-from-uber-nyc-general-manager-josh-mohrer/

the provision of a transportation service and is therefore obligated to comply with the transportation statutes and regulations of the ADA, found at 42 U.S.C § 12184 and 49 C.F.R. §§ 37.1-105.

42.     Given Paragraphs 18 through 40, as the provider of a transportation system, Uber is obligated to comply with the equivalent service standard set forth at 49 C.F.R. § 37.105.

B.     <u>Plaintiffs are Unable to Use Uber's New Orleans App and Transportation Services in Their Current Form</u>

43.     STEPHAN NAMISNAK and FRANCIS FALLS desire service from vehicles for hire to run errands, attend community meetings, reach medical appointments, access medical services, engage in recreational activities, and to participate in civic engagement events. Access to Uber's transportation services would provide Plaintiffs with a level of convenience not afforded or available by public transportation.

44.     STEPHAN NAMISNAK and FRANCIS FALLS cannot successfully use Uber transportation services because Uber has completely failed to provide a button, option, or icon on the Uber Application for the New Orleans metro market which would allow a wheelchair user to summon a van-equipped vehicle.

45.     STEPHAN NAMISNAK and FRANCIS FALLS are aware that UberASSIST exists, but are also aware that UberASSIST would not provide them with the ability to hail a lift-equipped vehicle. Without a lift-equipped vehicle Plaintiffs are unable to patronize Uber's services. Accordingly, Plaintiffs FALLS and NAMISNAK are presently deterred from downloading the Uber application.

46.     STEPHAN NAMISNAK and FRANCIS FALLS are presently aware that if they tried to install and use the Uber Application that they would experience serious difficulty accessing the goods and utilizing the services offered by that service as a result of Uber's (1) failure to provide a button, option, or icon which provides access to an accessible vehicle capable of transporting an electric wheelchair, (2) failure to provide auxiliary aids and services necessary to

allow full use and enjoyment of its transportation services, and (3) failure to ensure that a minimum number of accessible vehicles in Uber's fleet are wheelchair-accessible.

47.    STEPHAN NAMISNAK and FRANCIS FALLS desire to use the Uber Application, but fear that they will experience serious difficulty in utilizing the application due to the discrimination detailed herein.

48.    An accessible transportation option through the Uber app would make STEPHAN NAMISNAK and FRANCIS FALLS more independent.

49.    The ADA violations detailed herein exclude STEPHAN NAMISNAK and FRANCIS FALLS from the programs, services, and accommodations offered by Uber to the public.

50.    STEPHAN NAMISNAK and FRANCIS FALLS plan to and will attempt to use the Uber Application and Uber's programs, services, and accommodations in the future as patrons should those programs, services, and accommodations become wheelchair-accessible.

51.    STEPHAN NAMISNAK and FRANCIS FALLS presently fear that they will encounter the mobility-related barriers which exist within Uber's Application and services.

52.    STEPHAN NAMISNAK and FRANCIS FALLS desire to utilize the Uber Application and service, but will continue to experience serious difficulty until the ADA violations detailed herein are removed.

53.    STEPHAN NAMISNAK and FRANCIS FALLS intend to and will attempt to utilize Uber's programs, services, and accommodations in the future, but fear that Uber will continue to discriminate against them by failing to bring the Uber Application and transportation services into compliance with the requirements of the ADA.

54.    Upon information and belief, making the programs, services, and accommodations offered through the Uber Application accessible to persons with mobility-related disabilities who

1    use motorized wheelchairs is readily achievable, reasonably feasible, and easily accomplished, and

2    would not place an undue burden on Uber.

3      55. Upon information and belief, making the programs, services, and accommodations

4    offered through the Uber Application accessible would provide STEPHAN NAMISNAK and

5    FRANCIS FALLS with an equal opportunity to participate in, or benefit from, the programs,

6    services, and accommodations which Uber offers to the general public.

7      56. The harm sustained by Plaintiffs – the inability to access the services and

8    accommodations offered by Uber – is the expected and foreseeable consequence of Uber's failure

9    to comply with the requirements and mandates of the ADA. The statute and accompanying

10   regulations exist to ensure that those with mobility-related limitations will have full use of

11   transportation services. If Uber failed to adhere to its legal obligations under these regulations, it

12   was imminently foreseeable that individuals with disabilities would sustain the exact harms alleged

13   by Plaintiffs in this lawsuit.

14     57. MR. NAMISNAK and MR. FALLS have been obligated to retain the undersigned

15   counsel for the filing and prosecution of this action. STEPHAN NAMISNAK and FRANCIS

16   FALLS are entitled to have their reasonable attorneys' fees, costs, and expenses paid by Uber,

17   pursuant to 42 U.S.C. § 12205.

18     C. <u>Plaintiffs' Requested that Uber Modify its Policies, Procedures, and Practices to</u>
     <u>Provide them With Access to Uber's Services and Uber Failed to Modify its Policies,</u>
19   <u>Procedures, and Practices.</u>

20     58. General Order 56 of the Northern District of California requires that parties in an

21   ADA action conduct a meeting at which plaintiffs must "specify all claimed access violations and

22   the corrective actions requested of defendant."

23

24

59.     On April 19, 2018, the parties conducted a G.O. 56 meeting. At that meeting, Plaintiffs specified the corrective actions they request of Uber. This meeting took place prior to Plaintiffs' first amended complaint, filed May 8, 2018. (R. Doc. 54.)

60.     On September 23, 2018, MR. NAMISNAK and MR. FALLS, through their undersigned counsel sent Uber a letter / request entitled "Request for Reasonable Modification / Reasonable Accommodation in New Orleans, LA".

61.     This document was received by Uber, through its counsel, on September 23, 2018. The request for reasonable accommodation / reasonable modification is attached hereto as Exhibit "E". (hereinafter "September 23 Request"). Plaintiffs incorporate the entirety of the September 23 Request into this Second Amended Complaint by reference.

62.     In the September 23 Request, MR. NAMISNAK and MR. FALLS re-explained that they are persons with disabilities that live and reside in New Orleans, Louisiana, along with the nature of their disabilities and their usage of motorized wheelchairs.

63.     MR. NAMISNAK and MR. FALLS re-explained in the September 23 Request that their motorized wheelchairs cannot be folded and stored in the trunk of a car. Instead, to utilize vehicular transportation, Mr. Namisnak and Mr. Falls require a Wheelchair Accessible Vehicle ("WAV").

64.     MR. NAMISNAK and MR. FALLS re-explained in the September 23 Request that in New Orleans, Louisiana Uber offers services including UberX, UberXL, and UberAccess. Through the option of UberAccess, a customer can hail a driver trained by Uber in the folding and storing a conventional wheelchair; however, a customer cannot hail a driver with a WAV. Mr. Namisnak and Mr. Falls have assembled a substantial body of evidence that shows that Uber Technologies, Inc. and Rasier, LLC is operating a transportation network and exerts control over its drivers. The more Uber Technologies, Inc. and Rasier, LLC are operating a transportation network

and are controlling their drivers, then the more the drivers are operating "as an extension of Uber." *See Crawford v. Uber Technologies, Inc.*, No. 3:17-cv-02664-RS, R. Doc. 80, pp. 7. Further, "nothing in Section 12184 requires that an entity own or lease its own vehicles in order to qualify as a private entity providing taxi services within the meaning of the statute." *Id*."

65.     MR. NAMISNAK and MR. FALLS explained in the September 23 Request that they have amassed substantial evidence that Uber Technologies, Inc. and/or Rasier, LLC are providing WAV service or other reasonable accommodations in other cities, but not in New Orleans. For example, in San Francisco an individual can easily open the Uber Application, select the option "UberWAV" and hail an UberWAV. While the wait time might be longer, there are vehicles available on demand. Indeed, even undersigned counsel Garret DeReus took a screenshot of this service on September 20, 2018.[12] The same service is being provided by Uber in Chicago, Illinois; in New York, New York; and Washington, D.C., among others.

66.     MR. NAMISNAK and MR. FALLS explained in the September 23 Request that in other locations, Uber has utilized a variety of methodologies to provide WAV service. It would



12

appear from public records that in Chicago, Illinois Uber has run promotions seeking the retention of drivers with WAVs; according to news reports, Uber has been working with drivers and rental and leasing partners over the past year to expand its fleet and now has 65 WAVs on the road available through the app.[13] According to other reports, Uber has dispatched a fleet of more than 60 WAVs onto the streets of Philadelphia.[14] Clearly, Uber has the ability to utilize its nearly infinite resources to develop accessibility options that make its service meaningfully accessible to individuals with disabilities.

67.    MR. NAMISNAK and MR. FALLS explained in the September 23 Request that Uber has been under an obligation to change its policies/practices without sending a letter such as this one. Uber should have already changed its operational policy and made its services accessible to persons with disabilities.

68.    Following all this explanation, in the September 23 Request MR. FALLS and MR. NAMISNAK requested that Uber Technologies, Inc. and Rasier, LLC cease violating the ADA and utilize their resources, internal knowledge, and business know-how to change its operational policies and provide WAV service in New Orleans, Louisiana and its surrounding areas.

69.    MR. FALLS and MR. NAMISNAK then stated that they expected that, within seven (7) days of receipt of this letter, that Uber will begin providing WAV service in New Orleans, Louisiana.

70.    In the September 23 Request MR. FALLS and MR. NAMISNAK requested that, within seven days of Uber receipt of the letter, that Uber would ensure that a fleet of approximately 30-60 WAVs are available in New Orleans.

---

[13] http://www.chicagotribune.com/news/local/breaking/ct-uber-handicapped-accessibility-0720-20170719-story.html

[14] https://www.phillymag.com/business/2017/07/06/uber-lyft-wheelchair-accessible-wav/

SECOND AMENDED COMPLAINT

71.     In the September 23 Request MR. FALLS and MR. NAMISNAK explained that this fleet size is less than the fleet size of accessible vehicles Uber provides in Chicago and Philadelphia.

72.     In the September 23 Request MR. FALLS and MR. NAMISNAK explained that Uber has had sufficient of time, opportunity, and notice of the need to provide WAV service in New Orleans, Louisiana.

73.     In the September 23 Request MR. FALLS and MR. NAMISNAK explained that they do not possess the expertise to tell Uber how it must change its internal business practices and operations to provide WAV service in New Orleans, Louisiana. Plaintiffs further explained that ADA does not require them to tell Uber how to run its business.

74.     In the September 23 Request MR. FALLS and MR. NAMISNAK requested that, within seven days of Uber receipt of the letter, that Uber would ensure that a fleet of approximately 30-60 WAVs are available in New Orleans.

75.     In the September 23 Request MR. FALLS and MR. NAMISNAK requested that any UberWAV service Uber provides in New Orleans meet the equivalency standard of 49 C.F.R. § 37.105.

76.     In the September 23 Request MR. FALLS and MR. NAMISNKA explained that, given Uber's recent $72 billion valuation, they were confident that Uber could use its resources and problem-solving abilities to bring itself into compliance with the law without further delay.

77.     Despite the September 23 Request, Uber did not make its service accessible on Sunday, September 30, 2018.

78.     To date, a full eighteen (18) days after receiving the September 23 Request, and one-hundred and seventy-five (175) days after the G.O. 56 meeting, Uber has not made its service

SECOND AMENDED COMPLAINT

accessible in New Orleans or otherwise complied with Plaintiffs' request for reasonable accommodation / reasonable modification.

79.    Upon information and belief, Uber services in New Orleans remains in the same condition as it was when Plaintiffs made the September 23 Request.

80.    On September 29, 2018, Uber's attorney sent Plaintiffs correspondence stating that Uber "is considering Mr. Namisnak and Mr. Falls's requests."

81.    According to Uber, "That process will take some time, particularly in light of the sweeping nature of the requests.  Once Uber has had sufficient time to look into these issues and make decisions, we will follow up with a detailed, substantive response.  We expect this process to take a few weeks, but we will get back to you as soon as possible."

82.    By failing to make its service accessible within seven days, Uber denied Plaintiffs' request for reasonable accommodation / request for reasonable accommodation.

83.    By failing to make its service accessible within seven days, Uber constructively denied Plaintiffs' request for reasonable accommodation / request for reasonable accommodation.

84.    Uber completely failed to explain why it would need "a few weeks" to consider whether to bring itself into compliance with the ADA and stop discriminating against individuals with disabilities. This failure is especially egregious given that this lawsuit was originally filed on October 26, 2017 and, therefore, Uber has had three-hundred and fifty (350) days since the original complaint was filed to "consider" how to make its service accessible in New Orleans.

85.    In fact, as is set below, Uber has a variety of methodologies, practices, and procedures that it could be utilizing in New Orleans to make its service accessible – but Uber has completely failed to implement these services in New Orleans.

86.     Even worse, the evidence shows that Uber's failure to make its service accessible in "secondary markets" such as New Orleans is the result of Uber's focus on other, non-accessibility challenges.

D.     Uber's History of App Modifications.

87.     Upon information and belief, modification of the programs, services, and accommodations offered through the Uber Application could be easily accomplished, as is evidenced by the various promotions and modifications which are commonly made by Uber during the regular course of its operations.

88.     On January 5, 2015, Uber ran a promotion in New Orleans known as "Uber King Cakes." During this promotion, the Uber Application would display a small King Cake.[15] Customers could select this "King Cake" icon and have drivers deliver a King Cake to them for a fee. This change to the Uber Application was only present for one day. At the conclusion of the promotion, Uber restored the Uber Application to its original state.

89.     On Thursday, August 27, 2015, in Philadelphia, Pennsylvania Uber ran a promotion known as "UberPUPPIES."[16] During this promotion customers could utilize the Uber Application to have drivers deliver a live Puppy to their office for "15 minutes of puptastic playtime." Upon information and belief, at the end of the "UberPUPPIES" promotion, the Uber Application returned to its original state.

90.     On April 13, 2016, in New Orleans, Uber ran a promotion known as "UberDONUTS."[17] From 10:00am to 12:00pm, users could select a donut icon in their Uber app to have a driver deliver two free donuts to their door. At the end of the "UberDONUTS" promotion, the Uber application returned to its original state.

---

[15] *See* Exhibit "A."
[16] *See* Exhibit "B."
[17] https://newsroom.uber.com/us-louisiana/uberversary-donuts-on-demand/

SECOND AMENDED COMPLAINT

1     91.    The above examples demonstrate how easy it would be for Uber to provide a

2 wheelchair-accessible icon or button on its Uber application for the New Orleans metro market, as

3 it does in other cities. Despite the ease with which Uber could make its service available to persons

4 in a wheelchair, Uber has intentionally chosen to not provide services to persons who use motorized

5 wheelchairs in New Orleans.



**Fig. 1**: An image of Uber Access with the WAV option,
available in some cities – but not New Orleans, LA.
(*Source*: https://newsroom.uber.com/canada/uberwav/)

92.    In some limited locations, Uber have installed an icon on its Uber Application in an

attempt to comply with the ADA. In some cities, including San Francisco, Los Angeles, Portland,

and Washington D.C., Uber have installed on its Uber Application an icon known as Uber Access.

(*See* Figure One, *infra*.).

93.    Once a user selects the Access icon, one or two of two options appear: UberASSIST

and UberWAV.

94.    UberASSIST, according to Uber, "is designed to provide additional assistance to

seniors and people with disabilities. Driver-partners are specifically trained by Open Doors

Organization to assist riders into vehicles and can accommodate folding wheelchairs, walkers, and scooters."[18]

95.     However, according to Uber, "Note: ASSIST vehicles do not have accessible ramps."[19]

96.     Persons who use an electric wheelchair are unable to use UberASSIST as they require transportation with a ramp.

97.     Upon information and belief, in San Francisco, Los Angeles, and other cities, Uber offers UberWAV, which provides wheelchair accessible vehicles.

98.     Upon information and belief, Uber can remove their accessible icons at any time, thereby creating a significant need for injunctive relief.

99.     On September 2, 2014, Uber issued a press release stating that it was offering accessible transportation services in Houston, Texas.

100.     Upon information and belief, Uber began offering accessible transportation service in Houston, Texas called UberACCESS.

101.     As of May 6, 2017, the Uber Application for Houston, Texas does not feature or display UberACCESS. (*See* Figure 2, *Infra*).

---

[18] *See* Exhibit "C"
[19] *Id.*

SECOND AMENDED COMPLAINT



**Fig. 2**: An image of Uber's app available in Houston, Texas as
of May 6, 2017.
(*Source*: Screenshot taken by plaintiff's counsel)

102.    Upon information and belief, Uber either discontinued its UberACCESS service in Houston, Texas or no longer publicly displays the UberACCESS option. This demonstrates that Uber has the capability to reduce or eliminate its accessibility options at will, and evidences the need for injunctive relief.

103.    On information and belief, when a driver with a wheelchair-accessible vehicle in a city without UberWAV contacts Uber, they are told that they cannot participate in UberWAV.

104.    The actions committed by Uber which resulted in this lawsuit have their genesis or origin in the San Francisco, California.

105.    Upon information and belief, Uber created and performs modifications to the Uber Application from San Francisco, California.

106.    Upon information and belief, Uber enacts and supervises its policies from San Francisco, California.

107.    Upon information and belief, Uber exerts significant control over the implementation of its policies from San Francisco, California.

108.    Upon information and belief, Uber's supervision of its drivers occurs from San Francisco, California.

109.    On Tuesday, October 24, 2017, Uber sent out an email to its customers entitled "Shhh. Galantis has a secret show Thursday night."[20]

110.    The top of the email contained a photographs of the band Galantis. Immediately below the photograph was an image of Uber logo and the following text:

"This Thursday night, we're going to give you something to do–we're hosting a

secret show featuring Galantis!

Wanna run away to an exclusive performance? Your ticket is in your Uber app."

111.    Information about Uber's free Galantis show was widely publicized over the internet, including through Uber's Blog[21], through River Beats, a broadcasting and media production company in New Orleans[22], and through social media. (See Exhibit D.)

112.    Based on publicly available information, it is understood that on Thursday, October 26, 2017, at 6:00 p.m., Uber's application changed and displayed an option for "Galantis." Based on the information provided by Uber, customers who select this option will be picked up (along with 3 guests) and will brought to a secret show for an exclusive intimate performance by Galantis.

113.    Unfortunately, due to the lack of any options for the summoning of a Wheelchair

---

[20] Given the Court's October 3, 2018 ruling, Plaintiffs are no longer pressing their argument that Uber is operating a "place of public accommodation." However, the Galantis allegations are still relevant to the ease by which Uber could modify its application and make its services accessible.
[21] https://www.uber.com/blog/new-orleans/galantis-secret-show/ (last accessed on 10/25/2017).
[22] https://riverbeats.life/galantis-teams-uber-launch-secret-show-new-orleans/ (last accessed on 10/25/2017).

Accessible Vehicles through the Uber Application, Plaintiffs were completely excluded from the free, secret Galantis show that is hosted by Uber.

114.    Further, due to the "secret" nature of Uber's event featuring Galantis, Plaintiffs were unable to otherwise attend or patronize the event.

115.    Both Plaintiffs were aware of the free Galantis show hosted by Uber and were deterred from making an attempt to patronize this show due to Uber's complete failure to provide WAV or another means of accessing the event.

E.    <u>Uber's Accessibility Efforts in Other Markets Demonstrates that it would be Reasonable for Uber to Make its Service in New Orleans Accessible. Uber has Chosen Not to Do So as a Result of its Focus on Other Business Issues.</u>

116.    In other cities, there is a wide range of ways Uber works with the owners of WAVs to integrate said vehicles into its transportation system.

117.    ████████████████████████████████████████
████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

120.    Uber could make a public "request for providers" in New Orleans and see what companies apply.

121.    Upon information and belief, Uber has not made a public posting for providers in New Orleans area.

SECOND AMENDED COMPLAINT

122.    In addition to directly entering into contract with WAV providers, Uber also provides incentives to the drivers of WAVs in other cities.

123.    ██████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████

██████████████████████████████████████████████

████████████

██████████████████████████████████████████████

████████████████████████

126.    In an electronic communication believed to be dated August 5, 2016, Julia Winkler Jacobson of Uber documented that Uber has many business incentives to provide WAV service, stating "Launching WAV proactively can help us get ahead of costly regulations, facilitate airport agreements, and pave the way for ridesharing regulations Waiting to launch WAV increases the chances of % fleet mandates, required 24/7 service and accessibility surcharges."

127.    According to a July 20, 2017 public post on the website UberPeople.NET, an uber driver received a promotional email from Uber stating the following:

**Why drive with uberWAV?**

When driving with uberWAV in Chicago, you'll:*

- Keep the Uber Service Fee with uberWAV
- Receive $1,000 after you complete your first trip in a qualifying wheelchair-accessible vehicle
- Receive an additional $95 per week, when you complete 40 trips and are online for 35 hours in that week
- Gain access to a wheelchair-accessible vehicle through our lease partnerships.
- Receive uberX and uberWAV trip requests.

1    128.    Upon information and belief, Uber sent the above promotional email to drivers

2    and/or other persons in the Chicago area.

3    129.    Further, based on a screenshot of Uber's website taken on or about April 16, 2018, at

4    the URL www.uber.com/driver/services/uberwav, Uber has advertised that individuals who drive a

5    WAV in New Orleans can "Earn $1000 for your first 150 trips guaranteed in New Orleans.XXXXX,"[23]

6    Despite targeting its $1000 for 150 trips promotion to New Orleans, Uber has not turned on the

7    UberWAV option in New Orleans.

8    130.    In totality, the aforementioned emails, incentive programs, contracts, and service

9    agreement demonstrate that Uber has numerous incentives and methodologies for the provision of

10   WAV service. Uber's utilization of these incentives and methodologies in New Orleans would be a

11   natural, consistent, and cohesive part of its overall strategy. Uber's failure to adopt the policies,

12   procedures, and practices necessary for the provision of WAV service in New Orleans constitutes

13   facial discrimination.

14   131.    An internal Uber team or group was formed with the name "WC UberWAV Strike

15   Team."

16   132.    Despite knowing that making its service accessible is reasonable and required, Uber

17   has prioritized its focus on other business interests.

18   133.    For example, according to an electronic communication on the "WC UberWAV

19   Strike Team", on what is believed to be dated November 16, 2015, Christopher Ballard of Uber

20   stated "Given all of the other issues we're dealing with during this regulatory session, it appears

21   that WAV will be addressed next year. I'll address the group if this thinking changes."

22   134.    Upon information and belief, Mr. Ballard was discussing Uber's WAV service

23   generally.

24

[23] *See* Exhibit "F" (There is a superscript on the exhibit, but the superscript is unreadable due to pixelization).

SECOND AMENDED COMPLAINT

135.    Despite saying that WAV would be addressed "next year," almost three years later WAV service is still not available in New Orleans.

136.    Indeed, on what is believed to be August 5, 2016, Julia Winkler Jacobson of Uber sent out an email stating: "WAV is consistently unreliable, there's no standardized launch approach across cities."

137.    ████████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████████████

█████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

Uber's Utilization of New Vehicles that Triggers the "Equivalent Service" Standard.

139.    From approximately 2015 until January 30, 2018 Uber operated in various markets in conjunction with a subsidiary company known as Xchange Leasing, LLC.

140.    Through this company, Uber worked with drivers to help said individuals obtain a new vehicle.

141.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

142.    These new vans were leased in the following states: Virginia, Texas, Pennsylvania, Illinois, and Maryland.

143.    By having new vans in its transportation system, Uber triggered the requirements of 49 C.F.R. § 37.103(d), including the requirement that these new vans either be accessible or that Uber's overall transportation service meet the equivalent service requirement.

144.    Upon information and belief, even if Xchange Leasing, LLC was not controlled by Uber, Uber's partnership with Xchange Leasing, LLC demonstrates that Uber has reasonable options it can utilize put WAVs on the road and make its service meaningfully accessible.

145.    On or about January 30, 2018, Uber, Xchange Leasing, and a company known as Fair announced that the portfolio of Xchange Leasing had been purchased by Fair.[24]

146.    According to the press release "Fair will be the exclusive long-term vehicle solutions partner to Uber in the U.S. for drivers seeking vehicle access for 30 days or longer, and together the companies will work to develop customized new offerings that fit the needs of drivers, as well as integrations into Uber's products for drivers."

147.    Upon information, despite the fact that Uber could be working with its exclusive partner Fair, Uber has not taken steps to make its service in New Orleans meaningfully accessible.

### IV. CAUSE OF ACTION

### VIOLATIONS OF TITLE III
### OF THE AMERICANS WITH DISABILITIES ACT

148.    Plaintiffs re-allege and incorporate by reference the above allegations set forth in the Complaint as if fully set forth herein.

149.    Title III of the ADA prohibits discrimination against persons with disabilities by places of public accommodation and by private entities providing certain services, including

---

[24] https://www.prnewswire.com/news-releases/fair-and-uber-announce-strategic-partnership-fair-acquires-xchange-leasing-portfolio-300589935.html (last accessed October 8, 2018).

specified public transportation services. *Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 128 (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."); 42 U.S.C. § 12182 ("Prohibition of discrimination by public accommodations"); 42 U.S .C. § 12184 ("Prohibition of discrimination in specified public transportation services provided by private entities").

150.    "The term 'specified public transportation' means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10). Public transportation services include "demand responsive systems," which means "any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system." 42 U.S.C. § 12181(3).

151.    In addition, regulations promulgated by the United States Secretary of Transportation provide that: "No entity shall discriminate against an individual with a disability in connection with the provision of transportation service." 49 C.F.R. § 37.5(a).

152.    Uber provides a demand responsive transportation system as defined by 42 U.S.C. § 12181.

153.    Under Section 12184(a)(2) of the ADA, discrimination includes the failure of an entity to:

(A)    make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title;

(B)    provide auxiliary aids and services consistent with the requirements of section 12182(b)(2)(A)(iii) of this title; and

(C)    remove barriers consistent with the requirements of section 12182(b)(2)(A) of this title and with the requirements of section 12183(a)(2) of this title;

154.    Uber and its service providers have failed to provide any mechanism by which to adequately individuals who have mobility limitations, including Plaintiffs other similarly situated.

Moreover, Uber has refused to make reasonable accommodations in policies, practices, and procedures or to provide auxiliary aids and services necessary to allow full use and enjoyment of their transportation services by Plaintiffs. Uber has failed to remove the programmatic barriers to Plaintiffs' use of its services.

155.    Uber has discriminated and are discriminating against Plaintiffs in violation of the ADA by failing to provide accessible transportation services.

156.    Uber continues to discriminate against the Plaintiffs by failing to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford accessible transportation services to individuals with disabilities; and by failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, denied goods and services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.

157.    Additionally, by failing to provide access options to New Orleans users who require a motorized wheelchair, Uber has failed to meet the requirements of 49 C.F.R. § 37.167 that "the entity shall make available to individuals with disabilities adequate information concerning transportation services, [which] includes making adequate communications capacity available, though accessible formats and technology, to enable users to obtain information and schedule service."

158.    Uber has failed to provide Plaintiffs with a necessary auxiliary aid or service in the form of an "UberWAV" option or button on the Uber Application.

159.    Uber failed to grant Plaintiffs' September 23, 2018 reasonable modification / reasonable accommodation request.

160.    Plaintiffs have been injured by the discrimination they encountered when they were deterred from using Uber's transportation services and they continue to be injured by their inability

to patronize Uber's services. They have additionally been injured by the stigma of Uber's discrimination.

161. Plaintiffs' injuries are traceable to Uber's discriminatory conduct, policies, or lack of policies alleged herein and will be redressed by the relief requested. Plaintiffs have been injured and will continue to be injured by Uber's failure to comply with the ADA and Uber's ongoing, continued acts of discrimination.

162. Uber has control over its drivers' ADA compliance. For example, a term of the contract between Uber and its drivers bars drivers from denying users who have service animals:

> You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

163. The Uber contract with drivers does *not*, however, have a provision barring drivers from denying service to wheelchair users.

164. As a result of their inability to use Uber's services, Plaintiffs are suffering irreparable harm.

165. Although Plaintiffs have not downloaded or used the Uber Application, Title III of the ADA does not "require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188; *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1136–37 (9th Cir.2002) ("under the ADA, once a plaintiff has actually become aware of

SECOND AMENDED COMPLAINT

discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury," and "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues").

166.    Here, Plaintiffs are being deterred from patronizing Uber's services as a result of their personal knowledge of the violations stated above. Uber's refusal to provide service to people with disabilities in New Orleans is a topic of conversation among Plaintiffs' community. Plaintiffs are aware that UberWAV is offered in other cities but not in New Orleans.

167.    Plaintiffs have experienced the difficulty and frustration of past denials of services, including transportation services, in other contexts, and so chose not to engage in a process they know to be futile with Uber.

168.    Pursuant to 42 U.S.C. § 12188, this Court has authority to grant Plaintiffs' injunctive relief, including an Order that Uber's transportation services are in violation of the ADA and requiring Uber to alter the Uber Application to make it accessible to and useable by individuals with mobility disabilities to the full extent required by Title III of the ADA.

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment against Uber, and request the following relief:

A.    that this Court declare that Uber's policies, procedures, and services have been provided in a discriminatory manner which violates the ADA;

B.    that this Court declare that Uber has failed to provide Plaintiffs with reasonable modifications and necessary auxiliary aids;

C.    that this Court Order injunctive relief to require Uber to bring its transportation service into compliance and remain in compliance with federal anti-discrimination statutes;

D.    that this Court Order injunctive relief to require Uber grant Plaintiffs' reasonable

1    modification requests in the future;

2    E.    that this Court award reasonable attorneys' fees and costs (including expert fees) and other

3          expenses of suit; and

4    F.    that this Court award such other and further relief as it deems necessary, just, proper, and

5          appropriate.

6                              Respectfully submitted, this the 12th day of October, 2018,

7                              By Plaintiffs, by and through their counsel,

8
                                             /s/ GARRET S. DEREUS
9                                            BIZER & DEREUS, LLC
                                             Garret S. DeReus (LA # 35105)
10                                           Admitted *pro hac vice* gdereus@bizerlaw.com
                                             Andrew D. Bizer (LA # 30396)
11                                           Admitted *pro hac vice* andrew@bizerlaw.com
                                             3319 St. Claude Ave.
12                                           New Orleans, LA 70117
                                             T: 504-619-9999; F: 504-948-9996
13
                                             /s/ William Most
14                                           William Most (CA # 279100)
                                             AQUA TERRA AERIS LAW GROUP
15                                           828 San Pablo Ave., Ste. 115B
                                             Albany, CA 94706
16                                           Phone: (504) 509-5023
                                             Email: williammost@gmail.com
17

18

19

20

21

22

23

24

                                    - 31 -        SECOND AMENDED COMPLAINT