MORGAN, LEWIS & BOCKIUS LLP
Anne Marie Estevez (*pro hac vice*)
200 Biscayne Boulevard, Suite 5300
Miami, FL 33131
T:  305.415.3000
F:  305.415.3001
annemarie.estevez@morganlewis.com

Stephanie Schuster (*pro hac vice*)
Patrick Harvey (*pro hac vice*)
Clara Kollm (*pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington, DC  20004
T:  202.739.3000
F:  202.739.3001
stephanie.schuster@morganlewis.com
patrick.harvey@morganlewis.com
clara.kollm@morganlewis.com

Kathy H. Gao (CA Bar No. 259019)
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
T: 213.612.2500
F: 213.612.2501
kathy.gao@morganlewis.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHAN NAMISNAK and FRANCIS FALLS, | Case No. 3:17-cv-06124-RS |
| Plaintiffs, | **ANSWER TO SECOND AMENDED COMPLAINT** |
| v. | Judge: Hon. Richard Seeborg |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | |
| Defendants. | |

Defendants Uber Technologies, Inc. and Raiser, LLC (together, "Uber"), by and through counsel, answer the Second Amended Complaint filed in this action by Plaintiffs Stephan Namisnak and Francis Falls (ECF No. 86) as follows:

# I. INTRODUCTION

1.　　STEPHAN NAMISNAK is a person with a disability who lives in New Orleans, Louisiana.  MR. NAMISNAK has Muscular Dystrophy.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1, so the allegations are denied.

2.　　FRANCIS FALLS is a person with a disability who lives in New Orleans, Louisiana. MR. FALLS has paraplegia as a result of a spinal cord injury.  MR. FALLS is also missing his right arm.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2, so the allegations are denied.

3.　　Both Plaintiffs use a motorized wheelchair to get from place to place.  Plaintiffs can do practically everything a non-disabled person can do with the appropriate accommodations for their disability – work, travel, and enjoy life.  However, Plaintiffs are not able to drive.  As a result, Plaintiffs primarily rely on public transportation to get around the New Orleans metro area.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, so the allegations are denied.

4.　　Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber") provide a mobile-phone app service that allows users to call a car to drive them from point A to point B for a fee.  The app also allows people who own cars to sign up as drivers to provide those rides.

**ANSWER:** Uber admits that it offers technology that enables individuals who have registered Uber rider accounts and have agreed to Uber's Terms of Use ("Riders") to request a ride via a smartphone application, the Uber Rider App, from independent third-party transportation providers ("Drivers") who choose to seek and accept ride requests with a separate smartphone application, the Uber Driver App (both applications together, the "Uber Apps").  Uber denies the remaining allegations in Paragraph 4.

5.     Uber is operating a nation-wide demand-responsive transportation system.

**ANSWER:** Uber denies the allegations in Paragraph 5.

6.     In some cities, Uber has options for disabled users who use wheelchairs.  For example, if a user is in San Francisco, Portland, or Washington, D.C., they are shown an icon in the Uber app for "Uber Access."  By selecting that icon, those users shown options – UberASSIST and/or UberWAV.  UberASSIST allows a person with a disability to hail a driver who has been specifically trained to assist riders into vehicles and who can accommodate folding wheelchairs, walkers, and scooters.  UberWAV allows a person with a disability to hail a driver with a wheelchair-accessible vehicle that can accommodate a motorized wheelchair.

**ANSWER:** Uber admits that in some pilot cities the Uber Rider App includes a request option called "WAV" that enables Riders to request rides from Drivers who possess wheelchair accessible vehicles ("WAVs") and choose to use their WAVs to seek and accept ride requests via the Uber Driver App.   Uber otherwise denies the allegations in Paragraph 6.

7.     Due to Plaintiffs' need for a motorized wheelchair that cannot be folded up and be placed in a car's trunk, they are unable to utilize UberASSIST.  However, Plaintiffs could benefit and utilize UberWAV – if it was available in New Orleans.

**ANSWER:** Uber lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 7, so the allegations are denied.

8.     Unfortunately, Uber has refused to make the Uber WAV program available to New Orleans users.

**ANSWER:** Uber admits that the Uber Rider App does not currently include an option called "WAV" in New Orleans.  Uber otherwise denies the allegations in Paragraph 8.

9.     As a result of Uber's refusal to make UberWAV available in New Orleans, persons with disabilities in New Orleans have no ability to call an accessible vehicle through the Uber app

that will accommodate their needs.  Even if there are drivers on the road who have such a vehicle or training, there is no way for a New Orleans user to find an UberWAV vehicle through the app.  For this reason, Plaintiffs are excluded from Uber's transportation services and application.

**ANSWER:**  The allegations in the first and third sentences of Paragraph 9 contain conclusions of law to which no response is required.  To the extent a response is necessary, Uber denies the allegations in the first and third sentences of Paragraph 9.  Uber denies the allegations in the second sentence of Paragraph 9.

10.     Under the Americans with Disabilities Act, Uber is required to make reasonable modifications to its services, provide auxiliary aids and services, and remove barriers that deter persons with disabilities.  Uber is plainly able to do these things – as evidenced by the fact that it offers UberWAV elsewhere.  Furthermore, Uber's ability to revise its application is evident by its periodic special promotions in which Uber alters the application to connect users to puppies, cake, and donuts for a single day.  For example, on the evening of the filing of the original Complaint, Uber hosted a free, "secret" music concert in New Orleans that could only be reached by taking an Uber – and was therefore completely inaccessible to Plaintiffs.  Despite Uber's clear ability to alter its application, services, and attendant policies/practices, it has chosen not to provide sufficient wheelchair-accessible services in New Orleans, Louisiana.

**ANSWER:** Uber admits that the Uber Rider App does not currently include an option called "WAV" in New Orleans, that the Uber Rider App in some other cities includes an option called "WAV," and that Uber can and has altered the appearance and features of its technologies, including the Uber Apps.  The remaining allegations in Paragraph 10 are legal conclusions to which no response is required.  To the extent a response is necessary, Uber denies the remaining allegations in Paragraph 10.  Uber further states that, pursuant to the Court's March 13, 2020 Order,

ECF No. 102, Plaintiffs' claims, insofar as based on alleged failure to provide auxiliary aids, failure to remove barriers, and/or failure to communicate have been dismissed with prejudice.

11.     As such, Uber has violated its legal obligations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.*

**ANSWER:** The allegations in Paragraph 11 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 11.

12.     According to the U.S. Department of Justice Title III lawsuits over inaccessible transportation go "to the very heart of the ADA's goals 'to assure equality of opportunity, full participation, independent living, and economic self-sufficiency' for individuals with disabilities."[1] Plaintiffs seek to vindicate the promises of federal and state law.

**ANSWER:**   No response to the allegations in Paragraph 12 is required because the allegations are based on a document filed in *National Federation of the Blind v. Uber Technologies, Inc.*, No. 14-cv-4086 (N.D. Cal.), and that filing speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 12.

## II. JURISDICTION AND PARTIES

13.     Jurisdiction: This is an action for relief pursuant to Title III of the Americans With Disabilities Act, 42 U.S.C. § 12183 *et seq.*  This Court is vested with original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

**ANSWER:** The allegations in Paragraph 13 are legal conclusions to which no response is required.

---

[1] *National Federation of the Blind of California v. Uber Technologies, Inc.*, N.D. Cal. 14-cv-4086, R. Doc. 29 at 4.

Defendants' Answer to Plaintiffs' Second Amended Complaint

14.    Intradistrict Assignment: Because the claims described *infra* arose in the County of San Francisco, this case should be assigned to the San Francisco or Oakland Division of the Northern District of California per local Rule 3-2(d).

**ANSWER:** The allegations in Paragraph 14 are legal conclusions to which no response is required.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Uber is headquartered in San Francisco, California.

**ANSWER:** Uber admits that its headquarters is located in San Francisco, California.  The remaining allegations in Paragraph 15 are legal conclusions to which no response is required.

16.    Plaintiff STEPHAN NAMISNAK is a citizen and resident of New Orleans, Louisiana.  He uses a motorized wheelchair for mobility.  He is disabled within the meaning of the ADA.  Mr. Namisnak's motorized wheelchair cannot be folded into the trunk of a car.

**ANSWER:** The allegation in the third sentence of Paragraph 16 is a legal conclusion to which no response is required.  To the extent a response is required, the allegation in the third sentence of Paragraph 16 is denied.  Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16, so the remaining allegations are denied.

17.    Plaintiff FRANCIS FALLS is a citizen and resident of New Orleans, Louisiana.  He uses a motorized wheelchair for mobility.  He is disabled within the meaning of the ADA.  He requires wheelchair accessible vehicles for transportation.  He uses a motorized wheelchair that cannot be folded into the trunk of a car.

**ANSWER:** The allegation in the third sentence of Paragraph 17 is a legal conclusion to which no response is required.  To the extent a response is required, the allegation in the third sentence of Paragraph 17 is denied.  Uber lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17, so the remaining allegations are denied.

18.     Defendant UBER TECHNOLOGIES, INC. is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.  Uber Technologies, Inc.'s subsidiary, Rasier, LLC is registered with the Louisiana Secretary of State as charter number 41604705F.

**ANSWER:** Uber admits that  Uber Technologies, Inc. is a Delaware corporation, that Uber Technologies, Inc.'s principal place of business is located in San Francisco, California, that Rasier, LLC is a subsidiary of Uber Technologies, Inc., and that Rasier, LLC is registered with the Louisiana Secretary State as a Non-Louisiana Limited Liability Company.   The remaining allegations in Paragraph 18 are denied.

19.     Defendant RASIER, LLC is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.  Rasier, LLC is registered with the Louisiana Secretary of State as charter number 41585719Q.

**ANSWER:** Uber admits that Rasier, LLC was formed under Delaware law and that Rasier, LLC is registered with the Louisiana Secretary State as a Non-Louisiana Limited Liability Company with Charter Number 41585719Q.  The remaining allegations in Paragraph 19 are denied.

20.     Uber provides an extremely popular vehicles-for-hire service whereby Uber drivers pick up customers and provide them with transportation in an automobile.  Uber does not provide vehicles-for-hire services to mobility-impaired consumers in New Orleans who require wheelchair-accessible transportation vehicles that can accommodate an electric wheelchair.

**ANSWER:** Uber denies the allegations in Paragraph 20.

### III. FACTS

A.     <u>Uber operates a Vehicle-for-Hire Transportation System in New Orleans</u>

**ANSWER:**  The allegations in heading III.A are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in heading III.A

21.     Uber pioneered the vehicle-for-hire market across the United States.  Anyone with access to a smartphone can request travel services from Uber.  Uber's customers use a smartphone application to locate, schedule, and pay for their travel.  Consumers enter into contracts and business relationships by contacting Uber via electronic notification using an application downloaded to their smartphone (hereinafter known as the "Uber Application").  Upon receipt of a request from a consumer, Uber then dispatches a driver and vehicle to pick up the customer for transport to their desired location.  Through use of the Uber Application, consumers agree to pay for the services with a credit card via their smartphone.  These charges may include safety fees, municipal fees, and other fees.

**ANSWER:** Uber denies the allegations in Paragraph 21.

22.     Unlike taxi vehicles in New Orleans, where the fare rate is set by the New Orleans City Council, the fare rates for Uber customers is set by Uber according to Uber's confidential and secret algorithm.  Pursuant to Uber's confidential and secret algorithm, Uber can charge more for its services depending on the time of day, number of drivers, or estimated profitability.  The decision on the price displayed on the Uber Application is set solely by Uber (and not the driver).

**ANSWER:** Uber denies the allegations in Paragraph 22.

23.     Upon information and belief, Uber can deduct fare from a driver if a rider complains about his/her safety, the professionalism of the driver, cleanliness of the vehicle, or incorrect designation and/or charges, among other issues.

**ANSWER:** Uber denies the allegations in Paragraph 23.

24.     Uber requires that riders provide a "rating" of their driver prior to the next trip; Uber requests that drivers provide a "rating" of their rider prior to the next trip.  These rating facilitate the transportation experience and provide valuable data and information to Uber.

**ANSWER:** Uber admits that the Uber Rider App and Uber Driver App include the option to provide "ratings" for Drivers and Riders respectively, but denies the remaining allegations in Paragraph 24.

25.     Uber has the option and ability to temporarily or permanently deactivate a rider's account.

**ANSWER:** Uber admits that it licenses use of the Uber Rider App to Riders via and pursuant to the Terms of Use, which govern Uber's relationship with Riders.  The Terms of Use speak for themselves and set forth the circumstances in which Uber may deactivate a Rider's account.  Uber otherwise denies the allegations in Paragraph 25.

26.     Uber has the option and ability to temporarily or permanently deactivate a driver's account.

**ANSWER:** Uber admits that it licenses use of the Uber Driver App via and pursuant to a technology services agreements and the technology services agreements, which govern Uber's relationships with Drivers and speak for themselves, set forth circumstances in which Uber may deactivate a Driver's account.  Uber otherwise denies the allegations in Paragraph 26.

27.     Uber has the ability to charge a rider a "post-ride" fee (*i.e.* a cleaning fee) at the request of a rider.

**ANSWER:** Uber denies the allegations in Paragraph 27.

28.     In the New Orleans area, Uber has the ability to "geo-lock" certain locations and prevent drivers from visiting those geographic areas.

**ANSWER:** Uber denies the allegations in Paragraph 28.

29.     Upon information and belief, in the New Orleans area Uber has utilized its ability to "geo-lock" certain locations.

**ANSWER:** Uber denies the allegation in Paragraph 29.

30.     Upon information and belief, Uber has the ability to exclude drivers based on personal features – such as how many years they have had a driver's license in the United States.

**ANSWER:** Uber admits that it has generally applicable rules related to Drivers' access to and use of the Uber Driver App.   Uber otherwise denies the allegations in Paragraph 30.

31.     Upon information and belief, Uber has a policy against allowing individuals who have had a driver's license in the United States for less than one year from driving for Uber in the New Orleans area.

**ANSWER:** Uber admits that it offers licenses to use the Uber Driver App to Drivers subject to terms and conditions, and presently, one of those conditions is that Drivers have at least one year of licensed driving experience in the United States.   Uber otherwise denies the allegations in Paragraph 31.

32.     As part of its operation of a transportation service, Uber provides "Hotspots" and heat maps for the New Orleans and surrounding metro areas.  This further indicates that Uber is operating a transportation system.

**ANSWER:** Uber denies the allegations in Paragraph 32.

33.     During Mardi Gras Uber provides guides and instructions to drivers on how to get around and operate their vehicles by providing maps of road closure areas.

**ANSWER:** Uber admits that it has previously published a Carnival Guide to assist Drivers who chose to use the Uber Driver App to seek and accept ride requests in New Orleans during Mardi Gras.  Uber otherwise denies the allegations in Paragraph 33.

34.     Similarly, under the "Drivers" tab of its website, Uber provides "Safety pro-tips." These tips include the statement that "Our team is ready to help!  With 24/7 phone support, you can speak to one of our support specialists in the Uber Driver app.  Just tap 'HELP' and select the phone icon in the top-right corner."

**ANSWER:** Uber denies the allegations in Paragraph 34.

35.     Upon information and belief, Uber has (or had in the recent past) a policy against allowing individuals with non-Louisiana license plates from driving for Uber in the New Orleans area.

**ANSWER:** Uber denies the allegations in Paragraph 35.

36.     Upon information and belief, Uber assists, or has assisted, drivers with purchasing new cars via co-signing leases and/or ownership agreements (*i.e.* https://www.youtube.com/watch?v=5-Jx6G68Wpo).

**ANSWER:** Uber denies the allegations in Paragraph 36 and further states that the cited URL contains no content.

37.     Uber's prior CEO wrote on Uber's official blog: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a transportation system in a city near you."

**ANSWER:** No response to the allegations in Paragraph 37 is required because the allegations are based on a purported blog post, which speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 37.

38.     Upon information and belief, would-be drivers are required to pass a "city knowledge test" and attend a brief interview with an employee of Uber.  Upon information and belief, Uber has previously referred to itself as an "On-Demand Car Service."

**ANSWER:** Uber denies the allegations in Paragraph 38.

39.     As one court summed up:

Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring their performance, disciplining (or terminating) those who fail to meet standards, and setting prices.[2]

---

[2] *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1137 (N.D. Cal. 2015).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ANSWER:** No response to the allegations in Paragraph 39 is required because the allegations are based on a cited court decision, which speaks for itself. To the extent a response is required, Uber denies the allegations in Paragraph 39.

40. Uber has explicitly declared itself to be a "transportation system" over and over again. A few examples:

A. December 5, 2011: "We are 'Everyone's Private Driver.' We are Uber and we're rolling out a **transportation system** in a city near you."[3]

B. March 8, 2012: "So today could eventually be considered historical for the city of Angels because it is today that Uber LA **is officially rolling out its transportation system** in this fine city.  Now, how is some on-demand town car service calling itself a **transportation system**?  And how are a bunch of limos going to make this city better?  We've got a bunch of examples for you, but let me start with this: for every well utilized UberCar on the road, we're taking 6 cars off the road and out of parking garages."[4]

C. June 8, 2012: Uber seeks to deliver the "World's Finest **Transportation System**"[5]

D. August 2, 2013: "We're finally giving this city the **transportation system** that it deserves."[6]

E. Uber engineers' code "will contribute to accelerating the growth of a **transportation system** that will directly affect the lives of more than three million people every single day."[7]

F. August 22, 2014: Uber "provides the city with a more efficient transportation system."[8]

G. December 14, 2014: "Uber platform allows for sale and reliable riders, supporting and extending New Jersey's public **transportation system**."[9]

H. June 17, 2015: "Uber is proud to support the Taxi and Limousine Commission's revised rules which allow tech innovation to continue making

---

[3] https://newsroom.uber.com/take-ubers-new-logo-for-a-spin/
[4] https://newsroom.uber.com/us-california/uber-la-officially-launched/
[5] https://newsroom.uber.com/us-california/san-diego-launch/
[6] https://newsroom.uber.com/mexico/uber-has-launched-in-mexico-city/
[7] https://join.uber.com/engineering
[8] https://newsroom.uber.com/indonesia/delivering-a-new-choice-to-jakarta/
[9] https://www.uber.com/blog/new-jersey/uber-improves-public-transportation-in-new-jersey/

12

New York City's **transportation system** more progressive for all riders and drivers and ensure that drivers and passengers are protected."[10]

I.  July 22, 2015: "Together, we can build an even better, more reliable **transportation system**. This is great news for all New Yorkers, including Uber riders and drivers."[11]

**ANSWER:**  No response to the allegations in Paragraph 40, including subparagraphs A through I, is required because the allegations are based on statements from websites, which speak for themselves.  To the extent a response is required, Uber denies the allegations in Paragraph 40.

41.  Given Paragraphs 18 through 40, Uber is a transportation system and is engaged in the provision of a transportation service and is therefore obligated to comply with the transportation statutes and regulations of the ADA, found at 42 U.S.C. § 12184 and 49 C.F.R. §§ 37.1-105.

**ANSWER:** Uber denies the allegations in Paragraph 41.

42.  Given Paragraphs 18 through 40, as the provider of a transportation system, Uber is obligated to comply with the equivalent service standard set forth at 49 C.F.R. § 37.105.

**ANSWER:** Uber denies the allegations in Paragraph 42.

B.  <u>Plaintiffs are Unable to Use Uber's New Orleans App and Transportation Services in Their Current Form</u>

**ANSWER:**  Uber denies the allegations in heading III.B.

43.  STEPHAN NAMISNAK and FRANCIS FALLS desire service from vehicles for hire to run errands, attend community meetings, reach medical appointments, access medical services, engage in recreational activities, and to participate in civic engagement events.  Access to Uber's transportation services would provide Plaintiffs with a level of convenience not afforded or available by public transportation.

---

[10] https://newsroom.uber/com/us-new-york/statement-on-revised-tlc-rules/

[11] https://newsroom.uber.com/us-new-york/statement-from-uber-general-manager-josh-mohrer/

**ANSWER:** Uber denies that its offers transportation services.  Uber is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 43, so those allegations are denied.

44.     STEPHAN NAMISNAK and FRANCIS FALLS cannot successfully use Uber transportation services because Uber has completely failed to provide a button, option, or icon on the Uber Application for the New Orleans metro market which would allow a wheelchair user to summon a van-equipped vehicle.

**ANSWER:** Uber denies the allegations in Paragraph 44.

45.     STEPHAN NAMISNAK and FRANCIS FALLS are aware that Uber ASSIST exists, but are also aware that UberASSIST would not provide them with the ability to hail a lift-equipped vehicle.  Without a lift-equipped vehicle Plaintiffs are unable to patronize Uber's services. Accordingly, Plaintiffs FALLS and NAMISNAK are presently deterred from downloading the Uber application.

**ANSWER:** Uber is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 45, so the allegations are in the first sentence of Paragraph 45 are denied.  The allegations in the second sentence of Paragraph 45 are denied.  The allegations in the third sentence of Paragraph 45 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in the third sentence of Paragraph 45.

46.     STEPHAN NAMISNAK and FRANCIS FALLS are presently aware that if they tried to install and use the Uber Application that they would experience serious difficulty accessing the goods and utilizing the services offered by that service as a result of Uber's (1) failure to provide a button, option, or icon which provides access to an accessible vehicle capable of transporting an electric wheelchair, (2) failure to provide auxiliary aids and services necessary to allow full use and

enjoyment of its transportation services, and (3) failure to ensure that a minimum number of accessible vehicles in Uber's fleet are wheelchair-accessible.

**ANSWER:** Uber denies the allegations in Paragraph 46.

47.    STEPHAN NAMISNAK and FRANCIS FALLS desire to user the Uber Application but fear that they will experience serious difficulty in utilizing the application due to the discrimination detailed herein.

**ANSWER:** The allegation in Paragraph 47 of "discrimination" is a legal conclusion to which no response is required, but to the extent a response is required, the allegation is denied. Uber denies the remaining allegations in Paragraph 47.

48.    An accessible transportation option through the Uber app would make STEPHAN NAMISNAK and FRANCIS FALLS more independent.

**ANSWER:** Uber is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, so the allegations are denied.

49.    The ADA violations detailed herein exclude STEPHAN NAMISNAK and FRANCIS FALLS from the programs, services, and accommodations offered by Uber to the public.

**ANSWER:**  The allegations in Paragraph 49 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 49.

50.    STEPHAN NAMISNAK and FRANCIS FALLS plan to and will attempt to use the Uber Application and Uber's programs, services, and accommodations in the future as patrons should those programs, services, and accommodations become wheelchair-accessible.

**ANSWER:** Uber is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 relating to Plaintiffs' purported plans and intentions, so those allegations are denied.  Uber otherwise denies the allegations in Paragraph 50 and specifically denies that the Uber Rider App is not wheelchair accessible.

51.    STEPHAN NAMISNAK and FRANCIS FALLS presently fear that they will encounter the mobility-related barriers which exist within Uber's Application and services.

**ANSWER:** Uber is without knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 51 relating to Plaintiffs' purported fear, so that allegation is denied.  Uber otherwise denies the allegations in Paragraph 51.

52.    STEPHAN NAMISNAK and FRANCIS FALLS desire to utilize the Uber Application and service, but will continue to experience serious difficulty until the ADA violations detailed herein are removed.

**ANSWER:** Uber is without knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 52 relating to Plaintiffs' purported desire, so that allegation is denied.  Uber otherwise denies the allegations in Paragraph 52.

53.    STEPHAN NAMISNAK and FRANCIS FALLS intend to and will attempt to utilize Uber's programs, services, and accommodations in the future, but fear that Uber will continue to discriminate against them by failing to bring the Uber Application and transportation services into compliance with the requirements of the ADA.

**ANSWER:** Uber is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 relating to Plaintiffs' purported intentions and fear, so those allegations are denied.  Uber otherwise denies the allegations in Paragraph 53.

54.    Upon information and belief, making the programs, services, and accommodations offered through the Uber Application accessible to persons with mobility-related disabilities who use motorized wheelchairs is readily achievable, reasonably feasible, and easily accomplished, and would not place an undue burden on Uber.

**ANSWER:** The allegations in Paragraph 54 are argument and legal conclusions to which no response is required.   To the extent a response is required, Uber denies the allegations in Paragraph 54.

55.     Upon information and belief, making the programs, services, and accommodations offered through the Uber Application accessible would provide STEPHAN NAMISNAK and FRANCIS FALLS with an equal opportunity to participate in, or benefit from, the programs, services, and accommodations which Uber offers to the general public.

**ANSWER:** Uber denies the allegations in Paragraph 55.

56.     The harm sustained by Plaintiffs – the inability to access the services and accommodations offered by Uber – is the expected and foreseeable consequence of Uber's failure to comply with the requirements and mandates of the ADA.   The statute and accompanying regulations exist to ensure that those with mobility-related limitations will have full use of transportation services.   If Uber failed to adhere to its legal obligations under these regulations, it was imminently foreseeable that individuals with disabilities would sustain the exact harms alleged by Plaintiffs in this lawsuit.

**ANSWER:** Uber denies the allegations in Paragraph 56.

57.     MR. NAMISNAK and MR. FALLS have been obligated to retain the undersigned counsel for the filing and prosecution of this action.   STEPHAN NAMISNAK and FRANCIS FALLS are entitled to have their reasonable attorneys' fees, costs, and expenses paid by Uber, pursuant to 42 U.S.C. § 12205.

**ANSWER:** Uber denies the allegations in the first sentence of Paragraph 57.   The allegations in the second sentence of Paragraph 57 are legal conclusions and requests for relief to which no response is required.   To the extent a response is required, Uber denies the allegations in the second sentence of Paragraph 57 and denies that Plaintiffs are entitled to the relief requested.

C.      Plaintiffs' Requested that Uber Modify its policies, Procedures, and Practices to Provide them With Access to Uber's Services and Uber Failed to Modify its Policies, Procedures, and Practices.

**ANSWER**:  Uber denies the allegations in heading III.C.

58.     General Order 56 of the Northern District of California requires that parties in an ADA action conduct a meeting at which plaintiffs must "specify all claimed access violations and the corrective actions requested of defendant."

**ANSWER:** No response to the allegation in Paragraph 58 is required because the allegation quotes a General Order of this Court, which speaks for itself.

59.     On April 19, 2018, the parties conducted a G.O. 56 meeting.  At that meeting, Plaintiffs specified the corrective actions they request of Uber.  This meeting took place prior to Plaintiffs' first amended complaint, filed May 8, 2018. (R. Doc. 54.)

**ANSWER:** Uber admits that the parties met to discuss settlement on April 19, 2018, and that April 19, 2018 came before May 8, 2018. Uber denies the remaining allegations in Paragraph 59.

60.     On September 23, 2018, MR. NAMISNAK and MR. FALLS, through their undersigned counsel sent Uber a letter / request entitled "Request for Reasonable Modification / Reasonable Accommodation in New Orleans, LA".

**ANSWER:** Uber admits the allegations in Paragraph 60, but denies that Plaintiffs' request was reasonable.

61.     This document was received by Uber, through its counsel on September 23, 2018. The request for reasonable accommodation / reasonable modification is attached hereto as Exhibit "E". (hereinafter "September 23 Request").  Plaintiffs incorporate the entirety of the September 23 Request into this Second Amended Complaint by reference.

1    **ANSWER:** Uber admits that it received a copy of Plaintiffs' September 23, 2018 letter and

2    that the letter is attached as Exhibit E to the Second Amended Complaint. Uber otherwise denies

3    the allegations in Paragraph 61.

4    62.    In the September 23 Request, MR. NAMISNAK and MR. FALLS re-explained that

5    they are persons with disabilities that live and reside in New Orleans, Louisiana, along with the

6    nature of their disabilities and their usage of motorized wheelchairs.

7

8    **ANSWER:** No response to the allegations in Paragraph 62 is required because the

9    allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself. To the extent

10   a response is required, Uber denies the allegations in Paragraph 62.

11   63.    MR. NAMISNAK and MR. FALLS re-explained in the September 23 Request that

12   their motorized wheelchairs cannot be folded and stored in the trunk of a car.  Instead, to utilize

13   vehicular transportation, Mr. Namisnak and Mr. Falls require a Wheelchair Accessible Vehicle

14   ("WAV").

15

16   **ANSWER:** No response to the allegations in Paragraph 63 is required because the

17   allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself. To the extent

18   a response is required, Uber denies the allegations in Paragraph 63.

19   64.    MR. NAMISNAK and MR. FALLS re-explained in the September 23 Request that

20   in New Orleans, Louisiana Uber offers services including UberX, UberXL, and UberAccess.

21   Through the option of UberAcess, a customer can hail a driver trained by Uber in the folding and

22   storing a conventional wheelchair; however, a customer cannot hail a driver with a WAV.  Mr.

23   Namisnak and Mr. Falls have assembled a substantial body of evidence that shows that Uber

24   Technologies, Inc., and Raiser, LLC is operating a transportation network and exerts control over

25   its drivers.  The more Uber Technologies, Inc. and Rasier, LLC are operating a transportation

26   network and are controlling their drivers, then the more the drivers are operating "as an extension

27

28

of Uber." *See Crawford v. Uber Technologies, Inc.*, No. 3:17-cv-02664-RS, R. Doc. 80, pp. 7. Further, "nothing in Section 12184 requires that an entity own or lease its own vehicles in order to qualify as a private entity providing taxi services within the meaning of the statute." *Id.*"

**ANSWER:** No response to the allegations in the first and second sentences of Paragraph 64 is required because those allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself. To the extent a response is required, Uber denies the allegations in the first and second sentences of Paragraph 64. Uber denies the allegations in the third sentence of Paragraph 64. The allegations in the fourth and fifth sentences of Paragraph 64 are legal conclusions to which no response is required. To the extent a response is required, Uber denies the allegations in the fourth and fifth sentences of Paragraph 64.

65.     MR. NAMISNAK and MR. FALLS explained in the September 23 Request that they have amassed substantial evidence that Uber Technologies, Inc. and/or Rasier, LLC are providing WAV service or other reasonable accommodations in other cities, but not in New Orleans. For example, in San Francisco an individual can easily open the Uber Application, select the option "UberWAV" and hail an UberWAV. While the wait time might be longer, there are vehicles available on demand. Indeed, even undersigned counsel Garret Dereus took a screenshot of this service on September 20, 2018.[12] The same service is being provided by Uber in Chicago, Illinois; in New York, New York; and Washington, D.C., among others.

**ANSWER:** No response to the allegations in the first sentence of Paragraph 65 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself. To the extent a response is required, Uber denies the allegations in the first sentence of Paragraph 65. Uber lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 65, so the allegations are denied. The screenshot

---

[12] [Graphic omitted]

referenced in the fourth sentence of Paragraph 65 speaks for itself.  Uber admits that the Uber Rider App currently includes a WAV option in San Francisco, Chicago, New York City, Washington, DC, and a few other pilot markets, but otherwise denies the allegations in the second, third, and fifth sentences of Paragraph 65.

66.     MR. NAMISNAK and MR. FALLS explained in the September 23 Request that in other locations, Uber has utilized a variety of methodologies to provide service.  It would appear from public records that in Chicago, Illinois Uber has run promotions seeking the retention of drivers with WAVs; according to news reports, Uber has been working with drivers and rental and leasing partners over the past year to expand its fleet and now has 65 WAVs on the road available through the app.[13]  According to other reports, Uber has dispatched a fleet of more than 60 WAVS onto the streets of Philadelphia.[14]  Clearly, Uber has the ability to utilize its nearly infinite resources to develop accessibility options that make its service meaningfully accessible to individuals with disabilities.

**ANSWER:** No response to the allegations in the first, second, and third sentences of Paragraph 66 is required because the allegations are based on Plaintiffs' September 23, 2018 letter and purported reports, which speak for themselves. To the extent a response is required, Uber denies the allegations in the first, second, and third sentences of Paragraph 66.  Uber denies the allegations in the fourth sentence of Paragraph 66.

67.     MR. NAMISNAK and MR. FALLS explained in the September 23 Request that Uber has been under an obligation to change its policies/practices without sending a letter such as this one.  Uber should have already changed its operational policy and made its services accessible to persons with disabilities.

---

[13] http://www.chicagotribune.com/news/local/breaking/ct-uber-handicapped-accessibility-0720-20170719-story.html

[14] https://www.phillymag.com/business/2017/07/06/uber-lyft-wheelchair-accessible-wav/

**ANSWER:** No response to the allegations in Paragraph 67 is required because the allegations are based on Plaintiffs' September 23, 2108 letter, which speaks for itself. To the extent a response is required, Uber denies the allegations in Paragraph 67.

68.     Following all this explanation, in the September 23 Request MR. FALLS and MR. NAMISNAK requested that Uber Technologies, Inc. and Rasier, LLC cease violating the ADA and utilize their resources, internal knowledge, and business know-how to change its operational policies and provide WAV service in New Orleans, Louisiana and its surrounding areas.

**ANSWER:** No response to the allegations in Paragraph 68 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 68.

69.     MR. FALLS and MR. NAMISNAK then stated that they expected that, within seven (7) days of receipt of this letter, that Uber will begin providing WAV service in New Orleans, Louisiana.

**ANSWER:** No response to the allegations in Paragraph 69 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.  To the extent a further response is required, Uber denies the allegations in Paragraph 69.

70.     In the September 23 Request MR. FALLS and MR. NAMISNAK requested that, within seven days of Uber receipt of the letter, that Uber would ensure that a fleet of approximately 30-60 WAVs are available in New Orleans.

**ANSWER:** No response to the allegations in Paragraph 70 is required because the allegations are based on Plaintiffs' September 23, 2018, which speaks for itself.  To the extent a further response is required, Uber denies the allegations in Paragraph 70.

71.     In the September 23 Request MR. FALLS and MR. NAMISNAK explained that this fleet size is less than the fleet size of accessible vehicles Uber provides in Chicago and Philadelphia.

**ANSWER:** No response to the allegations in Paragraph 71 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 71.

72.     In the September 23 Request MR. FALLS and MR. NAMISNAK explained that Uber has had sufficient of time, opportunity, and notice of the need to provide WAV service in New Orleans, Louisiana.

**ANSWER:** No response to the allegations in Paragraph 72 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 72.

73.     In the September 23 Request MR. FALLS and MR. NAMISNAK explained that they do not possess the expertise to tell Uber how it must change its internal business practices and operations to provide WAV service in New Orleans, Louisiana.  Plaintiffs further explained that ADA does not require them to tell Uber how to run its business.

**ANSWER:** No response to the allegations in Paragraph 73 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 73.

74.     In the September 23 Request MR. FALLS and MR. NAMISNAK requested that within seven days of Uber receipt of the letter, that Uber would ensure that a fleet of approximately 30-60 WAVs are available in New Orleans.

**ANSWER:** No response to the allegations in Paragraph 74 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.

75.     In the September 23 Request MR. FALLS and MR. NAMISNAK requested that any UberWAV service Uber provides in New Orleans meet the equivalency standard of 49 C.F.R. § 37.105.

**ANSWER:** No response to the allegations in Paragraph 75 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.

76.     In the September 23 Request MR. FALLS and MR. NAMISNKA explained that, given Uber's recent $72 billion valuation, they were confident that Uber could use its resources and problem-solving abilities to bring itself into compliance with the law without further delay.

**ANSWER:** No response to the allegations in Paragraph 76 is required because the allegations are based on Plaintiffs' September 23, 2018 letter, which speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 76.

77.     Despite the September 23 Request, Uber did not make its service accessible on Sunday, September 30, 2018.

**ANSWER:** Uber denies the allegations in Paragraph 77.

78.     To date, a full (18) days after receiving the September 23 Request, and one-hundred and seventy-five (175) days after the G.O. 56 meeting, Uber has not made its service accessible in New Orleans or otherwise complied with Plaintiffs' request for reasonable accommodation / reasonable modification.

**ANSWER:** Uber denies the allegations in Paragraph 78.

79.     Upon information and belief, Uber services in New Orleans remains in the same condition as it was when Plaintiffs made the September 23 Request.

**ANSWER:** Uber denies the allegations in Paragraph 79.

80.     On September 29, 2018, Uber's attorney sent Plaintiffs correspondence stating that Uber "is considering Mr. Namisnak and Mr. Falls's requests."

**ANSWER:** Uber admits that its attorney sent Plaintiffs' counsel a letter dated September 29, 2018.  No further response is required because the September 29, 2018 letter speaks for itself.

81.     According to Uber, "That process will take some time, particularly in light of the sweeping nature of the requests.  Once Uber has had sufficient time to look into these issues and make decisions, we will follow up with a detailed, substantive response.  We expect this process to take a few weeks, but will get back to you as soon as possible."

**ANSWER:** No response to the allegations in Paragraph 81 is required because the allegations are based on Uber's September 29, 2018 letter, which speaks for itself.

82.     By failing to make its service accessible within seven days, Uber denied Plaintiffs' request for reasonable accommodation / request for reasonable accommodation.

**ANSWER:** Uber denies the allegations in Paragraph 82.

83.     By failing to make its service accessible within seven days, Uber constructively denied Plaintiffs' request for reasonable accommodation / request for reasonable accommodation.

**ANSWER:** Uber denies the allegations in Paragraph 83.

84.     Uber completely failed to explain why it would need "a few weeks" to consider whether to bring itself into compliance with the ADA and stop discriminating against individuals with disabilities.  This failure is especially egregious given that this lawsuit was originally filed on October 26, 2017 and, therefore, Uber has had three-hundred and fifty (350) days since the original complaint was filed to "consider" how to make its service accessible in New Orleans.

**ANSWER:** Uber denies the allegations in Paragraph 84.

85.     In fact, as is set below, Uber has a variety of methodologies, practices, and procedures that it could be utilizing in New Orleans to make its service accessible – but Uber has completely failed to implement these services in New Orleans.

**ANSWER:** Uber denies the allegations in Paragraph 85.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

86.     Even worse, the evidence shows that Uber's failure to make its service accessible in "secondary markets" such as New Orleans is the result of Uber's focus on other, non-accessibility challenges.

**ANSWER:** Uber denies the allegations in Paragraph 86.

D.      Uber's History of App Modifications.

**ANSWER**:  Uber admits that it has modified its technologies, including the Uber Apps.

87.     Upon information and belief, modification of the programs, services, and accommodations offered through the Uber Application could be easily accomplished as is evidenced by the various promotions and modifications which are commonly made by Uber during the regular course of its operations.

**ANSWER:** Uber admits that, from time to time, it modifies the appearance and features of its technologies, including the Uber Apps.  Uber denies the remaining allegations in Paragraph 87.

88.     On January 5, 2015, Uber ran a promotion in New Orleans known as "Uber King Cakes."  During this promotion, the Uber application would display a small King Cake. [15] Customers could select this "King Cake" icon and have drivers deliver a King Cake to them for a fee.  This change to the Uber Application was only present for one day.  At the conclusion of the promotion, Uber restored the Uber Application to its original state.

**ANSWER:** Uber denies the allegations in Paragraph 88.

89.     On Thursday, August 27, 2015, in Philadelphia, Pennsylvania Uber ran a promotion known as "UberPUPPIES."[16]  During this promotion customers could utilize the Uber Application to have drivers deliver a live Puppy to their office for "15 minutes of puptastic playtime."  Upon

---

[15] *See* Exhibit "A."
[16] *See* Exhibit "B."

information and belief, at the end of the "UberPUPPIES" promotion, the Uber Application returned to its original state.

**ANSWER:** No response to the allegations in Paragraph 89 is required because the allegations are based on a PDF printout of a portion of Uber's website, which speaks for itself.

90.     On April 13, 2016, in New Orleans, Uber ran a promotion known as "UberDONUTS."[17] From 10:00am to 12:00pm, users could select a donut icon in their Uber app to have a driver deliver two free donuts to their door.  At the end of the "UberDONUTS" promotion, the Uber application returned to its original state.

**ANSWER:** No response to the allegations in Paragraph 90 is required because the allegations are based on a webpage, which speaks for itself.

91.     The above examples demonstrate how easy it would be for Uber to provide a wheelchair-accessible icon or button on its Uber application for the New Orleans metro market, as it does in other cities.  Despite the ease with which Uber could make its service available to persons in a wheelchair, Uber has intentionally chosen to not provide services to persons who use motorized wheelchairs in New Orleans.

**ANSWER:** Uber denies the allegations in Paragraph 91.

92.     In some limited locations, Uber have installed an icon on its Uber application in an attempt to comply with the ADA.  In some cities, including San Francisco, Los Angeles, Portland, and Washington D.C., Uber have installed on its Uber Application an icon known as Uber Access. (*See* Figure One, *infra.*).

**ANSWER:** Uber admits that in certain areas, the Uber Rider App used to include an icon labelled Access.  Uber otherwise denies the allegations in Paragraph 92.

---

[17] https://newsroom.uber.com/us-louisiana/uberversary-donuts-on-demand/

93.     Once a user selects the Access icon, one or two of two options appear: UberASSIST and UberWAV.

**ANSWER:** Uber denies the allegations in Paragraph 93.

94.     UberASSIST, according to Uber, "is designed to provide additional assistance to seniors and people with disabilities.  Driver-partners are specifically trained by Open Doors Organization to assist riders into vehicles and can accommodate folding wheelchairs, walkers, and scooters."[18]

**ANSWER:** No response to the allegations in Paragraph 94 is required because the allegations are based on a PDF printout of Uber's website, which speaks for itself.

95.     However, according to Uber, "Note: ASSIST vehicles do not have accessible ramps."[19]

**ANSWER:** No response to the allegations in Paragraph 94 is required because the allegations refer to a PDF printout of Uber's website, which speaks for itself.

96.     Persons who use an electric wheelchair are unable to use UberASSIST as they require transportation with a ramp.

**ANSWER:** Uber admits that in some cities UberASSIST was not an option that enabled Riders to specifically request rides from Drivers in WAVs.  Uber otherwise denies that persons who use an electric wheelchair cannot use the Uber ASSIST icon.

97.     Upon information and belief, in San Francisco, Los Angeles, and other cities, Uber offers UberWAV, which provides wheelchair accessible vehicles.

**ANSWER:** Uber admits that the Uber Rider App in San Francisco, Los Angeles, and other pilot cities includes a WAV icon that enables Riders to specifically request rides from Drivers who

---

[18] *See* Exhibit "C"
[19] *Id.*

possess WAVs and choose to use their WAVs to seek and accept ride requests via the Uber Driver App.  Uber denies the remaining allegations in Paragraph 97.

98.    Upon information and belief, Uber can remove their accessible icons at any time, thereby creating a significant need for injunctive relief.

**ANSWER:** Uber admits that it is able to modify the appearance and features of its technologies, including the Uber Apps.  Uber otherwise denies the allegations in Paragraph 98.

99.    On September 2, 2014, Uber issued a press release stating that it was offering accessible transportation services in Houston, Texas.

**ANSWER:** Uber denies the allegations in Paragraph 99.

100.    Upon information and belief, Uber began offering accessible transportation service in Houston, Texas called UberACCESS.

**ANSWER:** Uber denies the allegations in Paragraph 100.

101.    As of May 6, 2017, the Uber Application for Houston, Texas does not feature or display UberACCESS.  (*See* Figure 2, *Infra*).

**ANSWER:** Uber admits that the Uber Rider App in Houston, Texas, does not include an option called UberACCESS.  Uber otherwise denies the allegations in Paragraph 101.

102.    Upon information and belief, Uber either discontinued its UberACCESS service in Houston, Texas or no longer publicly displays the UberACCESS option.  This demonstrates that Uber has the capability to reduce or eliminate its accessibility options at will, and evidences the need for injunctive relief.

**ANSWER:** Uber admits that the Uber Rider App in Houston, Texas does not include an option called UberACCESS.  Uber otherwise denies the allegations in Paragraph 102.

103.    On information and belief, when a driver with a wheelchair-accessible vehicle in a city without UberWAV contacts Uber, they are told that they cannot participate in UberWAV.

1

**ANSWER:** Uber denies the allegations in Paragraph 103.

2

104.     The actions committed by Uber which resulted in this lawsuit have their genesis or

3

origin in the San Francisco, California.

4

**ANSWER:** Uber denies the allegations in Paragraph 104.

5

6

105.     Upon information and belief, Uber created and performs modifications to the Uber

7

Application from San Francisco, California.

8

**ANSWER:** Uber denies the allegations in Paragraph 105.

9

106.     Upon information and belief, Uber enacts and supervises its policies from San

10

Francisco, California.

11

12

**ANSWER:** Uber denies the allegations in Paragraph 106.

107.     Upon    information    and    belief,    Uber    exerts    significant    control    over    the

13

implementation of its policies from San Francisco, California.

14

15

**ANSWER:** Uber denies the allegations in Paragraph 107.

16

108.     Upon information and belief, Uber's supervision of its drivers occurs from San

17

Francisco, California.

18

**ANSWER:** Uber denies the allegations in Paragraph 108.

19

20

109.     On Tuesday, October 24, 2017, Uber sent out an email to its customers entitled

21

"Shhh. Galantis has a secret show Thursday night."[20]

22

**ANSWER:** No response to the allegations in Paragraph 109 is required because the

23

allegations are based on an email, which speaks for itself.  To the extent a response is required,

24

Uber denies the allegations in Paragraph 109.

25

26

[20] Given the Court's October 3, 2018 ruling, Plaintiffs are no longer pressing their argument that Uber is operating a "place of public accommodation."  However, the Galantis allegations are still

27

relevant to the ease by which Uber could modify its application and make its services accessible. **ANSWER:**  Uber admits that this Court dismissed Plaintiffs' claims under 42 U.S.C. § 12182 by

28

order dated October 3, 2018.  Uber otherwise denies the allegations in footnote 20.

110.    The top of the email contained a photographs of the band Galantis.  Immediately below the photograph was an image of Uber logo and the following text:

"This Thursday night, we're going to give you something to do–we're hosting a secret show featuring Galantis!

Wanna run away to an exclusive performance? Your ticket is in your Uber app."

**ANSWER:** No response to the allegations in Paragraph 110 is required because the allegations are based on an email, which speaks for itself.

111.    Information about Uber's free Galantis show was widely publicized over the internet, including through Uber's Blog [21], through River Beats, a broadcasting and media production company in New Orleans[22], and through social media.  (See Exhibit D.)

**ANSWER:** No response to the allegations in Paragraph 111 is required because the allegations are based on a webpage and a PDF printout of a portion of Uber's website, which speak for themselves.  To the extent a response is required, Uber denies the allegations in Paragraph 111.

112.    Based on publicly available information, it is understood that on Thursday, October 26, 2017, at 6:00 p.m., Uber's application changed and displayed an option for "Galantis."  Based on the information provided by Uber, customers who select this option will be picked up (along with 3 guests) and will brought to a secret show for an exclusive intimate performance by Galantis.

**ANSWER:** Uber denies the allegations in Paragraph 112.

113.    Unfortunately, due to the lack of any options for the summoning of a Wheelchair Accessible Vehicles through the Uber Application, Plaintiffs were completely excluded from the free, secret Galantis show that is hosted by Uber.

**ANSWER:** Uber denies the allegations in Paragraph 113.

---

[21] https://www.uber.com/blog/new-orleans/galantis-secret-show/ (last accessed on 10/25/2017).
[22] https://riverbeats.life/galantis-teams-uber-launch-secret-show-new-orleans/ (last accessed on 10/25/2017).

1     114.    Further, due to the "secret" nature of Uber's event featuring Galantis, Plaintiffs were

2    unable to otherwise attend or patronize the event.

3         **ANSWER:** Uber denies the allegations in Paragraph 114.

4     115.    Both Plaintiffs were aware of the free Galantis show hosted by Uber and were

5    deterred from making an attempt to patronize this show due to Uber's complete failure to provide

6

7    WAV or another means of accessing the event.

8         **ANSWER:** Uber lacks knowledge or information sufficient to form a belief as to the truth

9    of the allegation that Plaintiffs were aware of the free Galantis show, so Uber denies that allegation.

10   Uber denies the remaining allegations in Paragraph 115.

11

12        E.    <u>Uber's accessibility efforts in Other Markets demonstrates that it would be
     Reasonable for Uber to Make its Service in New Orleans Accessible.  Uber has
13        Chosen Not to Do So as a Result of its Focus on Other Business Issues.</u>

14        **ANSWER:**  The allegations in subheading III.E include conclusions of law to which no

15   response is required.  To the extent a response is required, Uber denies those allegations.   Uber

16   denies the remaining allegations in heading III.E.

17        116.    In other cities, there is a wide range of ways Uber works with the owners of WAVs

18
     to integrate said vehicles into its transportation system.
19

20        **ANSWER:** Uber admits that, in the markets where it is piloting a WAV option in the Uber

21   Apps, it has experimented with a variety of methods to encourage both Riders and Drivers to make

22   use of the WAV option.  Uber otherwise denies the allegations in Paragraph 116.

23        117.    [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain

24   paragraphs of the Second Amended Complaint]

25        **ANSWER:** Uber denies the allegations in Paragraph 117.

26
          118.    [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain
27

28   paragraphs of the Second Amended Complaint]

1

**ANSWER:** Uber denies the allegations in Paragraph 118.

2

119.    [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain

3

paragraphs of the Second Amended Complaint]

4

**ANSWER:** No response to the allegations in Paragraph 119 is required because the

5

allegations are based on the terms of a contract, which speaks for itself.  To the extent a response

6

7

is required, Uber denies the allegations in Paragraph 119.

8

120.    Uber could make a public "request for providers" in New Orleans and see what

9

companies apply.

10

**ANSWER:** Uber denies the allegations in Paragraph 120.

11

121.    Upon information and belief, Uber has not made a public posting for providers in

12

New Orleans area.

13

14

**ANSWER:** Uber denies the allegations in Paragraph 121.

15

122.    In addition to directly entering into contract with WAV providers, Uber also

16

provides incentives to the drivers of WAVs in other cities.

17

**ANSWER:** Uber admits that it has voluntarily piloted incentives in certain pilot cities to

18

Drivers who possess WAVs.  Uber denies the remaining allegations in Paragraph 122.

19

123.    [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain

20

paragraphs of the Second Amended Complaint]

21

22

**ANSWER:** No response to the allegations in Paragraph 119 is required because the

23

allegations are based on the terms of a contract, which speaks for itself.

24

124.    [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain

25

paragraphs of the Second Amended Complaint]

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANSWER:** Uber admits that, in October 2017, Uber offered monetary incentives in pilot markets to encourage Drivers who possess WAVs to seek and accept WAV ride requests via the Uber Driver App.  Uber otherwise denies the allegations in Paragraph 124.

125.    [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain paragraphs of the Second Amended Complaint]

**ANSWER:** Uber admits that, in October 2017, Uber offered monetary incentives in pilot markets to encourage Drivers who possess WAVs to seek and accept WAV ride requests via the Uber Driver App.  Uber otherwise denies the allegations in Paragraph 124.

126.    In an electronic communication believed to be dated August 5, 2016, Julia Winkler Jacobson of Uber documented that Uber has many business incentives to provide WAV service, stating "Launching WAV proactively can help us get ahead of costly regulations, facilitate airport agreements, and pave the way for ridesharing regulations Waiting to launch WAV increases the chances of % fleet mandates, required 24/7 service and accessibility surcharges."

**ANSWER:** No response to the allegations in Paragraph 126 is required because the allegations are based on an email, which speaks for itself.   To the extent a response is required, Uber denies the allegations in Paragraph 126.

127.    According to a July 20, 2017 public post on the website UberPeople.NET, an Uber driver received a promotional email from Uber stating the following:

**Why drive with uberWAV?**

When driving with uberWAV in Chicago, you'll:*

- Keep the Uber Service fee with uberWAV

- Receive $1,000 after you complete your first trip in a qualifying wheelchair-accessible vehicle

- Receive an additional $95 per week, when you complete 40 trips and are online for 35 hours in that week
- Gain access to a wheelchair-accessible vehicle through our lease partnerships.
- Receive uberX and uberWAV trip request.

**ANSWER:** No response to the allegations in Paragraph 127 is required because the allegations are based on a copy of an email purportedly posted to a website not controlled by Uber, and that website post speaks for itself.

128.    Upon information and belief, Uber sent the above promotional email to drivers and/or other persons in the Chicago area.

**ANSWER:** Uber denies the allegations in Paragraph 128.

129.    Further, based on a screenshot of Uber's website taken on or about April 16, 2018, at the URL www.uber.com/driver/services/uberwav, Uber has advertised that individuals who drive a WAV in New Orleans can "Earn $1000 for your first 150 trips guaranteed in New Orleans.XXXXX,[23]  Despite targeting its $1000 for 150 trips promotion to New Orleans, Uber has not turned on the UberWAV option in New Orleans.

**ANSWER:** Uber admits that a WAV option is not currently available in the Uber Rider App in New Orleans.  Uber denies the remaining allegations in Paragraph 129.

130.    In totality, the aforementioned emails, incentive programs, contracts, and service agreement demonstrate that Uber has numerous incentives and methodologies for the provision of WAV service.  Uber's utilization of these incentives and methodologies in New Orleans would be a natural, consistent, and cohesive part of its overall strategy.  Uber's failure to adopt the policies,

---

[23] *See* Exhibit "F" (There is a superscript on the exhibit, but the superscript is unreadable due to pixelization).

35

procedures, and practices necessary for the provision of WAV service in New Orleans constitutes facial discrimination.

**ANSWER:** Uber denies the allegations in Paragraph 130.

131.   An internal Uber team or group was formed with the name "WC UberWAV Strike Team."

**ANSWER:** Uber admits that a team at Uber was called the "WC UberWAV Strike Team."

132.   Despite knowing that making its service accessible is reasonable and required, Uber has prioritized its focus on other business interests.

**ANSWER:** Uber denies the allegations in Paragraph 132.

133.   For example, according to an electronic communication on the "WC UberWAV Strike Team", on what is believed to be dated November 16, 2015, Christopher Ballard of Uber stated "Given all of the other issues we're dealing with during this regulatory session, it appears that WAV will be addressed next year.  I'll address the group if this thinking changes."

**ANSWER:** No response to the allegations in Paragraph 133 is required because the allegations are based on an e-mail, which speaks for itself.   To the extent a response is required, Uber denies the allegations in Paragraph 133.

134.   Upon information and belief, Mr. Ballard was discussing Uber's WAV service generally.

**ANSWER:** Uber denies the allegations in Paragraph 134.

135.   Despite saying that WAV would be addressed "next year," almost three years later WAV service is still not available in New Orleans.

**ANSWER:** Uber admits that a WAV option is not currently available in the Uber Rider App in New Orleans.  Uber denies the remaining allegations in Paragraph 135.

136.   Indeed, on what is believed to be August 5, 2016, Julia Winkler Jacobson of Uber sent out an email stating: "WAV is consistently unreliable, there's no standardized launch approach across cities."

**ANSWER:** No response to the allegations in Paragraph 136 is required because the allegations are based on an e-mail, which speaks for itself.

137.   [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain paragraphs of the Second Amended Complaint]

**ANSWER:** No response to the allegations in Paragraph 137 is required because the allegations are based on an e-mail, which speaks for itself.

138.   [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain paragraphs of the Second Amended Complaint]

**ANSWER:** Uber denies the allegations in Paragraph 138.

Uber's Utilization of New Vehicles that Triggers the "Equivalent Service" Standard.

**ANSWER:**  The allegations in the unnumbered heading between Paragraphs 138 and 139 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the in the unnumbered heading between Paragraphs 138 and 139.

139.   From approximately 2015 until January 30, 2018 Uber operated in various markets in conjunction with a subsidiary company known as Xchange Leasing, LLC.

**ANSWER:** Uber admits that Xchange Leasing, LLC was, but no longer is, a subsidiary of Uber Technologies, Inc.  The remaining allegations in Paragraph 139 are denied.

140.   Through this company, Uber worked with drivers to help said individuals obtain a new vehicle.

**ANSWER:** Uber denies the allegations in Paragraph 140.

141.    [Allegation omitted pursuant to the Court's October 17, 2018 order sealing certain paragraphs of the Second Amended Complaint]

**ANSWER:** Uber admits that it produced to Plaintiffs a copy of the document attached to the Second Amended Complaint as Exhibit G in response to a request for production propounded by Plaintiffs.  Uber denies the remaining allegations in Paragraph 141.

142.    These new vans were leased in the following states: Virginia, Texas, Pennsylvania, Illinois, and Maryland.

**ANSWER:** Uber denies the allegations in Paragraph 142.

143.    By having new vans in its transportation system, Uber triggered the requirements of 49 C.F.R. § 37.103(d), including the requirement that these new vans either be accessible or that Uber's overall transportation service meet the equivalent service requirement.

**ANSWER:** The allegations in Paragraph 143 include legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 143.

144.    Upon information and belief, even if Xchange Leasing, LLC was not controlled by Uber, Uber's partnership with Xchange Leasing, LLC demonstrates that Uber has reasonable options it can utilize put WAVS on the road and make its service meaningfully accessible.

**ANSWER:** Uber denies the allegations in Paragraph 144.

145.    On or about January 30, 2018, Uber, Xchange Leasing, and a company known as Fair announced that the portfolio of Xchange Leasing had been purchased by Fair.[24]

---

[24] https://www.prnewswire.com/news-releases/fair-and-uber-announce-strategic-partnership-fair-acquires-xchange-leasing-portfolio-300589935.html (last accessed October 8, 2018).

1   **ANSWER:** No response to the allegations in Paragraph 145 is required because the

2   allegations are based on a press release, which speaks for itself.  To the extent a response is required,

3   Uber denies the allegations in Paragraph 145.

4       146.   According to the press release "Fair will be the exclusive long-term vehicle solutions

5   partner to Uber in the U.S. for drivers seeking vehicle access for 30 days or longer, and together

6   the companies will work to develop customized new offerings that fit the needs of drivers, as well

7   as integrations into Uber's products for drivers."

8

9   **ANSWER:** No response to the allegations in Paragraph 146 is required because the

10  allegations are based on a press release, which speaks for itself.

11      147.   Upon information, despite the fact that Uber could be working with its exclusive

12  partner Fair, Uber has not taken steps to make its service in New Orleans meaningfully accessible.

13

14  **ANSWER:** Uber denies the allegations in Paragraph 147.

15                          **IV. CAUSE OF ACTION**

16                      <u>**VIOLATIONS OF TITLE III**</u>

17          <u>**OF THE AMERICANS WITH DISABILITIES ACT**</u>

18      148.   Plaintiffs re-allege and incorporate by reference the above allegations set forth in

19  the Complaint as if fully set forth herein.

20  **ANSWER:** Uber incorporates its responses to the allegations contained in this Answer as

21  if fully set forth herein.

22      149.   Title III of the ADA prohibits discrimination against persons with disabilities by

23  places of public accommodation and by private entities providing certain services, including

24  specified public transportation services.  *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128

25  (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal

26  enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, §

27

28

12184(a).”); 42 U.S.C. § 12182 (“Prohibition of discrimination by public accommodations”); 42 U.S.C. § 12184 (“Prohibition of discrimination in specified public transportation services provided by private entities”).

**ANSWER:** The allegations in Paragraph 149 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 149.

150.    “The term ‘specified public transportation’ means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis.”  42 U.S.C. § 12181(10).  Public transportation services include “demand responsive systems,” which means “any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system.”  42 U.S.C. § 12181(3).

**ANSWER:** The allegations in Paragraph 150 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 150.

151.    In addition, regulations promulgated by the United States Secretary of Transportation provide that: “No entity shall discriminate against an individual with a disability in connection with the provision of transportation service.”  49 C.F.R. § 37.5(a).

**ANSWER:** The allegations in Paragraph 151 are legal conclusions to which no response is required.

152.    Uber provides a demand responsive transportation system as defined by 42 U.S.C. § 12181.

**ANSWER:** The allegations in Paragraph 152 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 152.

153.    Under Section 12184(a)(2) of the ADA, discrimination includes the failure of an entity to:

(A)    Make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title;

(B)    Provide auxiliary aids and services consistent with the requirements of section 12182(b)(2)(A)(iii) of this title; and

(C)    Remove barriers consistent with the requirements of section 12182(b)(2)(A) of this title and with the requirements of section 12183(a)(2) of this title;

**ANSWER:** The allegations in Paragraph 153 are legal conclusions to which no response is required.

154.    Uber and its service providers have failed to provide any mechanism by which to adequately individuals who have mobility limitations, including plaintiffs other similarly situated. Moreover, Uber has refused to make reasonable accommodations in policies, practices, and procedures or to provide auxiliary aids and services necessary to allow full use and enjoyment of their transportation services by Plaintiffs.  Uber has failed to remove the programmatic barriers to Plaintiffs' use of its services.

**ANSWER:** The allegations in Paragraph 154 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 154.  Uber further states that, pursuant to the Court's March 13, 2020 Order, ECF No. 102, Plaintiffs' claims, insofar as based on alleged failure to provide auxiliary aids, have been dismissed with prejudice.

155.    Uber has discriminated and are discriminating against Plaintiffs in violation of the ADA by failing to provide accessible transportation services.

**ANSWER:** The allegations in Paragraph 155 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 155.

156.    Uber continues to discriminate against the Plaintiffs by failing to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford accessible transportation services to individuals with disabilities; and by failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, denied goods and

services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.

**ANSWER:** The allegations in Paragraph 156 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 156.  Uber further states that, pursuant to the Court's March 13, 2020 Order, ECF No. 102, Plaintiffs' claims, insofar as based on alleged failure to provide auxiliary aids, have been dismissed with prejudice.

157.    Additionally, by failing to provide access options to New Orleans users who require a motorized wheelchair, Uber has failed to meet the requirements of 49 C.F.R. § 37.167 that "the entity shall make available to individuals with disabilities adequate information concerning transportation services, [which] includes making adequate communications capacity available, though accessible formats and technology, to enable users to obtain information and schedule service."

**ANSWER:**  The allegations in Paragraph 157 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 157.  Uber further states that, pursuant to the Court's March 13, 2020 Order, ECF No. 102, Plaintiffs' claims, insofar as based on alleged violation of 49 C.F.R. § 37.167, have been dismissed with prejudice.

158.    Uber has failed to provide Plaintiffs with a necessary auxiliary aid or service in the form of an "UberWAV" option or button on the Uber Application.

**ANSWER:** The allegations in Paragraph 158 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 158.  Uber further states that, pursuant to the Court's March 13, 2020 Order, ECF No. 102, Plaintiffs' claims, insofar as based on alleged failure to provide auxiliary aids, have been dismissed with prejudice.

159.   Uber failed to grant Plaintiffs' September 23, 2018 reasonable modification / reasonable accommodation request.

**ANSWER:** Uber denies the allegations in Paragraph 159.

160.   Plaintiffs have been injured by the discrimination they encountered when they were deterred from using Uber's transportation services and they continue to be injured by their inability to patronize Uber's services.   They have additionally been injured by the stigma of Uber's discrimination.

**ANSWER:** The allegations in Paragraph 160 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 160.

161.   Plaintiffs' injuries are traceable to Uber's discriminatory conduct, policies, or lack of policies alleged herein and will be redressed by the relief requested.  Plaintiffs have been injured and will continue to be injured by Uber's failure to comply with the ADA and Uber's ongoing, continued acts of discrimination.

**ANSWER:** The allegations in Paragraph 161 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 161.

162.   Uber has control over its drivers' ADA compliance.  For example, a term of the contract between Uber and its drivers bars drivers from denying users who have service animals:

> You understand and agree that you have a legal obligation under the Americans with Disabilities act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections.  Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement.  You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

**ANSWER:** Uber denies the allegations in the first sentence of Paragraph 162.  No response to the remaining allegations in Paragraph 162 is required because the remaining allegations are based on a contract, which speaks for itself.  To the extent a response is required to those remaining allegations, Uber denies them.

163.     The Uber contract with drivers does *not*, however, have a provision barring drivers from denying service to wheelchair users.

**ANSWER:** No response to the allegations in Paragraph 163 is required because the allegations are based on a contract, which speaks for itself.  To the extent a response is required, Uber denies the allegations in Paragraph 163.

164.     As a result of their inability to use Uber's services, Plaintiffs are suffering irreparable harm.

**ANSWER:** The allegations in Paragraph 164 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 164.

165.     Although plaintiffs have not downloaded or used the Uber Application, Title III of the ADA does not "require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions."  42 U.S.C. § 12188; *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136–37 (9th Cir. 2002) ("under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury," and "[s]o long as the discriminatory conditions continue, and so long as a plaintiffs is aware of them and remains deterred, the injury under the  ADA continues").

**ANSWER:** Uber admits that Plaintiffs have not downloaded or used the Uber Rider App. The remaining allegations in Paragraph 165 are legal conclusions to which no response is required. To the extent a response is required, Uber denies the remaining allegations in Paragraph 165.

166.   Here, Plaintiffs are being deterred from patronizing Uber's services as a result of their personal knowledge of the violations stated above.  Uber's refusal to provide service to people with disabilities in New Orleans is a topic of conversation among Plaintiffs' community.  Plaintiffs are aware that UberWAV is offered in other cities but not in New Orleans.

**ANSWER:** Uber denies the allegations in Paragraph 166.

167.   Plaintiffs have experienced the difficulty and frustration of past denials of services, including transportation services, in other contexts, and so chose not to engage in a process they know to be futile with Uber.

**ANSWER:** The allegations about futility in Paragraph 167 are legal conclusions to which no response is required.  To the extent a response is required, Uber denies the allegations about futility in Paragraph 167.  Uber is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 167, so the remaining allegations are denied.

168.   Pursuant to 42 U.S.C. § 12188, this Court has authority to grant Plaintiffs' injunctive relief, including an Order that Uber's transportation services are in violation of the ADA and requiring Uber to alter the Uber Application to make it accessible to and usable by individuals with mobility disabilities to the full extent required by Title III of the ADA.

**ANSWER:** The allegations in Paragraph 168 are legal conclusions and a request for relief to which no response is required.  To the extent a response is required, Uber denies the allegations in Paragraph 168 and denies that Plaintiffs are entitled to the relief requested.

## VI. RELIEF REQUESTED

1
2
3
4
5

The allegations that follow the heading "Relief Requested" in the Second Amended Complaint, including Paragraphs A through F, are not allegations of fact, but are requests for relief to which no response is required.  To the extent a response is deemed necessary, Uber denies that Plaintiffs are entitled to the relief requested or to any relief whatsoever.

6
7

### GENERAL DENIAL

Any allegation in the Second Amended Complaint not expressly admitted herein is denied.

8

### AFFIRMATIVE AND OTHER DEFENSES

9
10
11
12
13
14
15

Uber asserts the following affirmative and other defenses.  To the extent any of the defenses, in whole or in part, serves to negate only an element of Plaintiffs' cause of action, Uber does not seek to relieve Plaintiffs of their burden of proof or persuasion on that element, nor does Uber assume the burden of proof of any other burden, if such burden would otherwise be Plaintiffs'. Uber reserves all rights to amend or modify these defenses consistent with the Federal Rules of Civil Procedure.

16
17
18
19
20

1.      Plaintiffs are bound to Uber's Terms of Use under the doctrine of equitable estoppel, and pursuant to the Terms of Use, Plaintiffs are obligated to arbitrate their claims.  Accordingly, this action should be stayed pending mandatory arbitration pursuant to Uber's Terms of Use.  *See* ECF No. 26, 33.

21

2.      The Court lacks subject-matter jurisdiction because Plaintiffs lack standing.

22
23

3.      Plaintiffs lack a private right of action under Title III of the ADA because Plaintiffs are not being subjected to discrimination.  *See* 42 U.S.C. § 12188.

24
25

4.      Uber is not subject to 42 U.S.C. § 12184 because Uber is not a private entity primarily engaged in the business of transporting people.

26
27
28

5.      Uber is not subject to 42 U.S.C. § 12184 because Uber does not provide specified public transportation.

6.      Uber is not subject to 42 U.S.C. § 12184 because the transportation providers who choose to use the Uber Driver App to seek and accept ride requests are independent actors who are not agents of Uber and whom Uber does not employ or control.

7.      Insofar as Uber is subject to 42 U.S.C. § 12184, Plaintiffs fail to state a claim based on a failure to provide auxiliary aids or services, as the Court already held.  ECF No. 102.

8.      Insofar as Uber is subject to 42 U.S.C. § 12184, Plaintiffs fail to state a claim based on a failure to remove barriers, as the Court already held.  ECF No. 102.

9.      Insofar as Uber is subject to 42 U.S.C. § 12184, Plaintiffs fail to state a claim based on a failure to communicate, as the Court already held.  ECF No. 102.

10.     Insofar as Uber is subject to 42 U.S.C. § 12184, Plaintiffs have not requested that Uber make modifications to any policies, practices, or procedures that are necessary to afford the goods, services, facilities, privileges, advantages, or accommodations Uber offers to the public to individuals with disabilities..

11.     Insofar as Uber is subject to 42 U.S.C. § 12184, Plaintiffs have not requested that Uber make reasonable modifications to policies, practices, or procedures.

12.     Insofar as Uber is subject to 42 U.S.C. § 12184 and Plaintiffs have requested that Uber make reasonable and necessary modifications to policies, practices, or procedures, Uber did not deny Plaintiffs' request because Uber referred Plaintiffs to transportation providers in New Orleans that provide service in wheelchair accessible vehicles.

13.     Insofar as Uber is subject to 42 U.S.C. § 12184 and Plaintiffs have requested that Uber make reasonable and necessary modifications to policies, practices, or procedures, the requested modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations Uber offers to the public.

14.     Insofar as Uber is subject to 42 U.S.C. § 12184, Uber has not discriminated against Plaintiffs on the basis of disability.

15.     Insofar as Uber is subject to 42 U.S.C. § 12184, Plaintiffs cannot demonstrate that Uber violated any obligation imposed by the statute or applicable regulations.

16.     Insofar as Uber is subject to 42 U.S.C. § 12184, Uber is not required to provide or guarantee service in wheelchair accessible vehicles.

17.     Insofar as Uber is subject to 42 U.S.C. § 12184, Uber is not required to provide or guarantee service that meets the standard set forth in 49 C.F.R. § 37.105.

18.     To the extent not already included in any of the foregoing defenses, Plaintiffs have failed to state a claim upon which relief can be granted for the reasons asserted in Uber's motions to dismiss Plaintiffs' First Amended Complaint and Second Amended Complaint.  *See* ECF Nos. 60, 78 98, and 101.

19.     Plaintiffs cannot demonstrate any entitlement to injunctive relief because Plaintiffs cannot demonstrate an imminent risk of irreparable harm to Plaintiffs.

20.     Plaintiffs cannot demonstrate any entitlement to injunctive relief because Plaintiffs cannot demonstrate that the balance of equities weighs in favor of injunctive relief.

21.     Plaintiffs cannot demonstrate any entitlement to injunctive relief Plaintiffs do not seek and cannot craft an injunction that complies with the requirements of Federal Rule of Civil Procedure 65 and otherwise comports with due process.

22.     Plaintiffs cannot demonstrate that they are entitled to declaratory relief.

23.     Plaintiffs cannot demonstrate that they are entitled to an award of attorneys' fees or costs.

Dated: March 27, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:  s/ Anne Marie Estevez

Anne Marie Estevez
Stephanie Schuster
Patrick Harvey
Clara Kollm
Kathy H. Gao

*Attorneys for Defendants*